**In re CONSOLIDATED LITIGATION CONCERNING INTERNATIONAL HARVESTER'S DISPOSITION OF WISCONSIN STEEL.**

Nos. 81 C 7076, 82 C 6895 and 85 C 3521.

United States District Court, N.D. Illinois, E.D.

July 17, 1987.

Leonard A. Grossman, Office of the Sol., Dept. of Labor, Chicago, Ill., William O. Bittman, George R. Clark, T. Timothy Ryan, Jr., Richard D. Lerner, Pirerson, Ball & Dowd, Robert L. Furst, Pension Benefit Guar. Corp., Washington, D.C., for plaintiff.

Arthur C. O'Meara III, (in house), Navistar Intern. Corp., Chicago, Ill., Donald G. Kempf, Jr., Philip S. Beck, Chaim T. Kiffel, David M. Elston, Kirklan & Ellis, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

In 1977 International Harvester Company ("IH"), now known as Navistar International Corporation, sold the assets of its Wisconsin Steel Division ("Wisconsin Steel") to various entities under the control of Envirodyne Industries, Inc. The buyers assumed responsibility for Wisconsin Steel's pension liabilities. In 1980 the buyers filed petitions in bankruptcy. In this action, the buyers, the Pension Benefit Guaranty Corporation ("PBGC") and a class of Wisconsin Steel's former employees all claim that IH knew the buyers of Wisconsin Steel were doomed to fail and that the transaction was a sham to avoid Wisconsin Steel's pension liabilities. IH denies that claim, contending that in 1977 it was faced with various unpleasant alternatives and it chose one which it thought had a reasonable chance of success.

During discovery IH refused to produce over 1900 documents, relying on the attorney-client privilege or the attorney work product doctrine. The PBGC has moved for an order under Rule 37(a) of the Federal Rules of Civil Procedure, compelling IH to produce some 265 of those documents. The documents fall into three broad categories: (1) those concerning legal advice about IH's disposition of Wisconsin Steel; (2) those concerning legal advice about IH's pension liability; (3) those concerning Cravath, Swaine & Moore's advice that IH have an independent investment banker evaluate the Wisconsin Steel transaction.

Generally, the attorney-client privilege attaches to confidential communications between attorneys and their clients, made for the purpose of obtaining legal advice or assistance. *See, e.g., United States v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983). The privilege is construed narrowly and the party asserting it has the burden of establishing all of its essential elements. *Id.* On this motion, PBGC argues that IH waived any privilege as to the documents it seeks. Because the court believes that IH's treatment of the communications at issue is inconsistent with any intention to maintain their confidentiality, the PBGC's motion is granted in substantial part. *See, e.g., Lawless*, 709 F.2d at 487 (transmission of information for use in preparing a tax return destroys any expectation of confidentiality that might otherwise have existed); *Suburban Sew 'N Sweep, Inc. v. Swiss-Bernina, Inc.*, 91 F.R.D. 254, 258 (N.D.Ill.1981); *cf. In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1314 (7th Cir.1984) (affirming an order allowing newspapers access to corporation's special litigation committee report where the report was used as evidence in a motion to terminate a shareholder's derivative suit). *See generally* Marcus, *The Peril of Privilege: Waiver and the Litigator*, 84 Mich.L.Rev. 1605, 1627–48 (1986).

## I. Reliance on Advice of Counsel

Communications between IH and its attorneys have achieved considerable prominence in this litigation so far. In its original motion to compel, the PBGC briefly mentioned that IH's apparent reliance on the advice of counsel in defending this action was an alternate ground for granting the motion. As the Seventh Circuit acknowledged in *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir.1987), a party implicitly waives any claim of privilege by relying on a legal claim or defense, the truthful resolution of which will re-

quire examining confidential attorney-client communications. *See, e.g., United States v. Mierzwicki,* 500 F.Supp. 1331, 1335 (D.Md.1980); *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975). However, *Lorenz* also holds that, at least under Indiana law, such a waiver does not occur where the party asserting the privilege merely denies the plaintiff's allegations.

 The attorney-client communications at issue here bear on IH's state of mind in disposing of Wisconsin Steel. The PBGC maintains that IH has injected state-of-mind issues into this case by raising its good faith business judgment as a defense. However, its complaint belies that assertion. For example, the PBGC alleges that IH "entered into the purported sale with purpose and intent to absolve itself of responsibility for, and to insulate itself from, liability for" the unfunded pension liabilities, and that IH "intended and acted to avoid the appearance that the purported sale was a sham or a device primarily intended to avoid liability" (amended compl. ¶¶ 35, 36). The attorney-client communications are unquestionably relevant to those allegations, but that alone does not defeat IH's claim of privilege. Nor does IH's denial of those allegations by itself result in a waiver of the privilege, as *Lorenz* illustrates.

 IH disclaims any intention of relying upon an "advice of counsel" defense, going so far as to say that any legal advice it may have received is irrelevant (opposing mem. at 4–5). However, its defense position is that it acted reasonably on the basis of the information known to it. Attorney-client communications appear to comprise a significant portion of that information. If IH were to rely on those communications to show that it acted reasonably, there is little doubt that the attorney-client privilege would be waived as to those communications and others pertaining to the same subject matter. *See McCormick on Evidence* § 93 at 224 (E. Clearly, 3d ed. 1984). The waiver would result even if IH were not relying on an advice-of-counsel theory, *i.e.,* that it acted in good faith because it did what its attorneys counseled it to do.

These observations alone render IH's privilege claims somewhat suspect. Nevertheless, if IH could present its defense without disclosing any attorney-client communications, and it intended to do so, and if the PBGC's "reliance on the advice of counsel" were the only basis for finding that a waiver of the attorney-client privilege had occurred, this court would be reluctant to grant the PBGC's motion.

## II. Disclosures

But reliance on the advice of counsel was not the main thrust of the PBGC's original motion to compel. Rather, the PBGC's primary argument was that IH waived its claims of privilege because attorney-client communications had been disclosed to third parties with some frequency. Analytically, the disclosures fall into three categories: (1) selective disclosures during discovery; (2) general disclosure of IH documents in response to PBGC document requests; and (3) disclosures in connection with the Wisconsin Steel transaction itself.

### A. Selective Disclosures

 Several IH executives who had participated in the Wisconsin Steel transaction testified about attorney-client communications in their depositions. For example, on February 15, 1985, Omer G. Voss, a former executive vice-president and then vice-chairman of IH then in charge of Wisconsin Steel, disclosed various attorney-client communications at his deposition, over no objection from IH attorneys:

I had asked the question about what is Harvester's responsibility and do we have a continuing responsibility the rest of our lives for the obligation that Envirodyne is assuming on the pensions and the answer our law department always gave was, "We have checked with the PBGC. We have done all the investigating we can. We have checked with counsel, and there is no law on the subject."

I said I couldn't believe it. They said, "We can't tell you." I said, "How long must they continue before Harvester would be relieved?" He said, "You may never have this responsibility because

the law is unclear. As long as you made the sale it's not possible. It's not possible for us to say you have to fall off the log in 20 years, 10 years, 5 years or 2 years." I said to you this morning, "Do you know?" and I don't know a lawyer that does know, so I never could get an answer to my question here.

\* \* \* \* \* \*

... I was told by the lawyers that they had been through the Pension Benefit Guaranty people and they had showed this deal to them, and the Pension Benefit Guaranty people said they had no objection. And I says, "Well, what does that mean?" They said, "We don't know." I said, "Does that mean we have any continuing responsibility?" And they said, "We don't think so if they accept it, but we don't know. We can't guarantee you that, nor can the PBGC."

(Motion to compel, attachment B at 115–16.) Similarly, in response to the question as to whether and how long Harvester must carry the pension liabilities on its balance sheet, Voss was permitted to testify that his attorneys advised "[w]e don't know. The law doesn't state, and so nobody can answer your question." *Id.* at 192–93. Voss disclosed various attorney-client communications throughout his deposition testimony, including other communications concerning IH's ERISA liability (*id.* at 61, 117, 151, 181–85, 190, 192, 246, 247), the extent of that liability (*id.* at 115), and legal opinions rendered to IH's board of directors (*id.* at 155, 181–85).

James J. Doyle, a former executive vice-president of IH, similarly disclosed attorney-client communications in deposition testimony. At one point during the deposition IH's counsel objected that certain documents fell within the attorney-client privilege. Nevertheless, Mr. Doyle later testified that IH's law department supplied him with the information underlying his statement that

in the event that Envirodyne is unable to profitably manage and operate these properties ... IH would become responsible, in all probability, for some portion

of the unfunded pension liability up to five years after the date of purchase. (Motion to compel, attachment C at 502.) Doyle also testified that IH's law department thought that IH's responsibility for Wisconsin Steel's unfunded pension liabilities was an open question (motion to compel, attachments C, D and E). In addition, Dr. Karl D. Bays, a member of IH's board of directors, stated in a deposition without any objection from IH counsel that

[a]s I testified on two other occasions, and the documents you showed me earlier, Bill Crawford, the general counsel for the company, said there was no legal obligation [for IH to pay the pension benefits].

(Motion to compel, attachment F at 190.)

Brooks McCormick, president and chief executive officer at the time of the Wisconsin Steel transaction, testified at his December 16, 1985 deposition that IH's accountants and law department told him, along with the rest of IH's board of directors, that IH's share of Wisconsin Steel's unfunded pension obligations could reach $86 million if Envirodyne was unsuccessful (suppl. motion to compel, attachment A at 557–59). McCormick also testified that Cravath, Swaine & Moore, a New York law firm retained by IH, recommended that IH bring in an investment banking firm to review the Wisconsin Steel transaction (*id.* at 517–18).

IH responds that no waiver occurred because the selected disclosures did not involve substantive legal advice. That characterization is inaccurate. Among other things, IH witnesses testified about opinions and conclusions of IH's lawyers concerning IH's continuing liability for unfunded pension benefits. Even though those opinions and conclusions apparently were based in part on meetings with the PBGC, they fell within the attorney-client privilege.

■ IH also contends that McCormick's mere disclosure that he was acting on the advice of counsel in retaining Lehman Brothers did not reveal any privileged communications, relying on *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 516–17 (D.Conn.),

*appeal dismissed,* 534 F.2d 1031 (2d Cir. 1976). In *SCM,* the court stated that privileged advice does not lose its protection when the client adopts it, so that when a deponent is asked about reasons underlying a particular decision it is enough for the deponent to answer that he was acting on the advice of his attorney. When those reasons are *limited* to reliance on protected advice, further testimony need not be given. *Id.* (emphasis in original).

IH's reliance on *SCM* here is misplaced. McCormick had already testified to the reasons for retaining an investment banker:

> I think it was felt advisable. I think it was felt judicious. I think it was felt as a duty to our directors and our shareholders; and I feel that it was a common practice to take another look just before making a fatal step, forward or backwards. And this would not be inimicable with our practice in other cases of the company; so that it seemed a perfectly logical step, and we proceed on that basis.

(Suppl. motion to compel, attachment A at 517.) He then disclosed that Cravath was at least partially responsible for the recommendation.

If this were the only disclosure concerning Cravath, Swaine & Moore's recommendation, the waiver issue as to this subject matter would be a closer one. However, as discussed below, IH also disclosed the recommendation and the reasons for it to third parties. IH's proposed analogy to a witness who states only that he will not testify, invoking the Fifth Amendment "on the advice of counsel," is inapplicable on these facts.

▇▇▇▇ The general rule is that voluntary disclosure of privileged attorney-client communication constitutes waiver of the privilege as to all other such communications on the same subject. *See, e.g., Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 23–25 (9th Cir.1981). This rule reflects two general principles: (1) only confidential matters are protected by the attorney-client privilege; and (2) a party should not be allowed to exploit selective disclosures for tactical advantage. As Judge Flaum summarized,

> a party cannot selectively divulge privileged information without impairing its attorney-client privilege as to the rest of that information concerning the same subject.... The privilege exists in the first instance to encourage communication from a client to his attorney, and for that reason the confidence of such communications must be protected.... Protection of the opinions given by attorneys to their clients gives rise to similar benefits, and consequently has been treated as part of the privilege.... Once a party abandons this confidence by submitting privileged material in the discovery proceeding, the rationale of the privilege is dissipated, insofar as the subject matter of the disclosure is concerned.
>
> * * * * * *
>
> ... In some instances, a tactical advantage of a limited disclosure may be readily apparent, and equity stridently counsels a finding that the privilege has been waived.... Partial disclosure, however, always creates the possibility of abuse at a time when the confidentiality of the relationship has been compromised by the very party who wishes to assert it later.... Whenever a party discloses information which it could have withheld on the basis of privilege, an implicit determination of benefit has been made by the party, through its attorney. Since the rationale of the confidence is at the same time obviated, no purpose would be served by a court's consideration of the tactical consequences of partial disclosure.

*B & J Mfg. Co. v. FMC Corp.,* 21 Fed.R. Serv.2d (Callaghan) 1119, 1119–20 (N.D.Ill. 1975) (citations and footnote omitted); *see also Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454, 457–58 (N.D.Ill.1974) (Bauer, J.) (observing that "when a party's conduct reaches a certain point of disclosure fairness requires that the privilege should cease whether the party intended that result or not," but holding that waiver did not occur on the facts presented) *aff'd mem.,* 534 F.2d 330 (7th

Cir.1976). In the *FMC* case waiver occurred as a result of deposition testimony, but the same principle applies to the selective disclosure of documents. *Nye v. Sage Products, Inc.*, 98 F.R.D. 452, 453 (N.D.Ill. 1982). *See generally* 4 J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 26.60[2] at 26–201–03 n. 32 (2d ed. 1986).

## B. Document Production

■ Besides disclosing particular attorney-client communications in depositions and individual documents, IH allowed the PBGC extensive access to its document files on three occasions. Document production in this case began in 1981. IH opened its non-privileged files to the PBGC on several occasions between 1981 and 1984. It asserts that on each of these occasions it screened the files for privileged materials.

After 1984, new lawyers for the PBGC became involved in this case and new document requests were filed. IH objected to searching through its files again to find the requested documents and it refused to produce them. In ruling on the PBGC's motion to compel, Judge Grady stated that he

> would not require Harvester to go back through 100,000 documents and organize them for you or to look for something you could as easily find by yourself by looking. Basically, it is a question of who pays for the looking. I think generally the person seeking ought to do the paying.
>
> \* \* \* \* \* \*
>
> ... You can work it out yourselves. If it is easy to retrieve, Harvester should do it. If it can't be retrieved, then just make the 100,000 documents available again, and you can go in there on your own time and your own expense and find it.

(Motion to compel, appendix L at 28–29.)

In February and May 1986, IH allowed the PBGC to search through its files. Except for five boxes of new material, IH did not screen the files for privileged documents. After the PBGC identified the documents it wanted, it asked IH for copies. Only then did IH attempt to assert the attorney-client privilege by failing to provide copies of documents the PBGC had already seen. Another series of disclosures took place on March 31 and April 1, 1987, when IH allowed the PBGC to inspect certain of its pension files. One of IH's in-house attorneys and a paralegal from Kirkland & Ellis were present, but again no measures were taken to prevent the disclosure of privileged communications. Again, it was only after the PBGC requested copies that IH asserted its claims of privilege.

The PBGC contends that IH has waived any claim of privilege as to the documents IH allowed it to examine. The court agrees. Ordinarily a party that allows free access to its files cannot later claim that some of the documents they contained were privileged. *See, e.g., W.R. Grace & Co. v. Pullman, Inc.*, 446 F.Supp. 771, 775–76 (W.D.Okl.1976) ("not withstanding the apparently voluminous amount of discovery involved ... defendant could have taken necessary steps to remove purportedly privileged documents prior to permitting discovery ..."); *United States v. Kelsey-Hayes Wheel Co.*, 15 F.R.D. 461, 465 (E.D. Mich.1954) (no privilege for particular documents after government attorneys were allowed to examine files where documents were "indiscriminately mingled with the other routine documents of the corporation ..."). Nor can IH's conduct here be characterized as inadvertent, as that term is used by some courts in preserving privilege claims. *See, e.g., Hartford Fire Ins. v. Garvey*, 109 F.R.D. 323 (N.D.Cal.1985) (reviewing inadvertent disclosure cases); *Mendenhall v. Barber-Greene Co.*, 531 F.Supp. 951, 955 (N.D.Ill.1982) (applying standards for waiving constitutional rights in analyzing waiver of the attorney-client privilege). IH screened its files for privileged matter earlier in this litigation, so it must have known that they contained attorney-client communications. Moreover, IH's reliance on Judge Grady's order to avoid the waiver doctrine is misplaced. This is not a case like *Transamerica Computer Co. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir.1978), where a massive expedited discovery program made

some disclosures of privileged material inevitable, despite extraordinary precautions.

Rather, this case is more like *Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir.1981), where a party was willing to compromise confidentiality for its own benefit. Judge Grady ordered IH to make its files available to the PBGC because IH was unwilling to bear the expense of searching for the documents that PBGC wanted. IH apparently did not raise the problem of searching through its files to identify privileged matters, a task it claims to have undertaken previously in any event. *See also Transamerica*, 573 F.2d at 649–50, 652 (privilege claims preserved where disclosure problems were brought to trial judge's attention); *cf. Maryville Academy v. Loeb Rhoades & Co.*, 559 F.Supp. 7 (N.D.Ill.1982) (compliance with SEC subpoena resulted in waiver); *Teachers Insurance and Annuity Ass'n v. Shamrock Broadcasting Co.*, 521 F.Supp. 638 (S.D.N. Y.1981) (disclosure pursuant to SEC subpoena without objection would result in waiver unless confidentiality was expressly reserved, *e.g.*, by stipulation or protective order). IH has lost any claim of privilege as to the documents it allowed the PBGC to examine.

### C. Disclosures to Third Parties

The record shows that IH disclosed attorney-client communications to third parties on many occasions in connection with the Wisconsin Steel transaction. For example, a First National Bank of Chicago internal memorandum indicates that IH disclosed certain attorney-client communications to George Sealy, a former Envirodyne officer. In bringing the bank up to date on the Wisconsin Steel transaction, Sealy and bank personnel

> talked about the pension liability for Wisconsin Steel. George Sealy said that if Envirodyne failed in its efforts to run Wisconsin Steel, International Harvester would step in and take it over.... Evidently Harvester's board also discussed this possibility and has had their attorneys and accountants consider the possibility. It is the experts' opinion that if Wisconsin Steel did fail, Harvester would

have to step in to avoid termination of the pension plans. Harvester feels that they would still be on the hook even though the agreements will specifically state that Envirodyne takes all the responsibility for the plan at the time that they made the acquisition.

(Motion to compel, attachment H.) In addition, a letter from Doyle to Sealy included substantially all of a letter from IH pension attorney Hyman Biegel to IH general counsel William Crawford, concerning discussions between IH's Washington counsel and PBGC about IH's potential pension liability (suppl. motion to compel, attachment B). Similar disclosures were made to Dr. Linde, another Envirodyne officer. At Linde's deposition he testified that Mr. Booth and Mr. Doyle had commented on different occasions

> that Harvester did not feel that they would automatically be off the hook on pension liabilities as a result of the deal; that the exposure would be reduced, because it would be limited only in terms of PBGC claims against Harvester, but they felt that after a five-year period, in consulting with pension counsel, that they would be entirely off the hook. And each year, it would diminish during the five-year period, so the liability would go down at the closing to whatever the PBGC liability would be, and then would diminish over a five-year period.

(Motion to compel, attachment P at 484–85.)

IH retained the investment banking firm of Lehman Brothers, Inc. to evaluate the Wisconsin Steel transaction. Deposition testimony by Linde and Sealy indicates that attorney-client communications between IH and Cravath, Swaine & Moore regarding the need for an investment banker were disclosed. Sealey testified that Doyle told him

> Duffy—or no, the senior partner of Cravath, not Duffy, I forget his name—recommended to the Harvester board that they should engage an independent investment banker to render judgment on the plan.

Sealy further explained that Doyle told him Cravath's reason for the recommendation was to have "on the record that an independent, unbiased opinion would corroborate that this was, in fact, the right thing for Harvester to do" (motion to compel, attachment M at 432). Sealy further testified that Dole told him that David Brownwood, a partner at Cravath, Swaine & Moore,

> was basically opposed to the deal and ... was the one who had recommended to the board that in order for the board to be protected they had better engage an outside investment banker to in effect bless the transaction.

(Suppl. motion to compel, attachment M at 990–91.) Similarly, Linde testified that Doyle told him Cravath recommended that an investment banker be consulted because Doyle and the proponents of the Wisconsin Steel transaction "have to convince a lot of people, because, you know, some of the directors are opposed to it, and Omer [Voss] is opposed to it and the attorneys. And they feel the deal is too thin or too risky, or you are not putting in enough money" (motion to compel, attachment P at 541).

An internal Lehman Brothers memorandum confirms the disclosures to Sealy and Linde. They apparently relayed to Lehman Brothers that

> [t]he Board of Directors of International Harvester have approved the sale to Envirodyne. They have been asked by Cravath, Swaine & Moore that they should have the transaction expertised by an outside investment banker.
>
> The purpose of the opinion to be rendered by the investment banker relates to: (1) the consideration received by International Harvester as being fair; and (2) Envirodyne has the capability of sustaining the operation in concert with Engelhard Minerals. CS & M considers the opinion necessary should litigation ensure.

(Motion to compel, attachment L.)

Once Lehman Brothers became involved in the Wisconsin Steel transaction, IH disclosed attorney-client communications to them as well. McCormick testified at his deposition that IH gave Lehman Brothers all the information it had about the transaction.

> Q. And that would include legal opinions that Harvester might have on the pension liabilities?
>
> A. We would not have—in good faith, I would not have meaningfully and directly precluded from careful observation the consultant who had been an outside consultant who had been authorized by our board of directors to look at a case without giving them full and complete access to all of our documents, including to our board. We wouldn't dream of doing such a thing.
>
> Q. And that would include legal opinions, if there were any?
>
> A. Everything, everything, everything.

(Supplemental motion to compel, attachment A at 585.) A list of documents received by Lehman Brothers from IH confirms McCormick's testimony (PBGC reply mem., exh. 3).

 Attorney-client communications made in the presence of third parties are not privileged unless the third party's presence is consistent with an intention to keep the communications confidential. *See, e.g., Suburban Sew 'N Sweep,* 91 F.R.D. at 258; *McCormick on Evidence* § 91 at 218. Similar principles apply where attorney-client communications, even though privileged originally, are disclosed to third parties. Attorney-client communications disclosed to a third party for the purpose of assisting the attorney in rendering legal advice remain privileged, *see. e.g. United States v.*

*Kovel,* 296 F.2d 918 (2d Cir.1961), but those disclosed for other purposes do not. *See, e.g., In re John Doe Corp.,* 675 F.2d 482, 488–89 (2d Cir.1982) (disclosures to accountant to resolve audit issues and to underwriting counsel in connection with a public offering); *In re Horowitz,* 482 F.2d 72, 80–82 (2d Cir.) (disclosures to accountant unrelated to seeking of legal advice), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *SEC v. Texas Int'l Airlines, Inc.,* 29 Fed.R.Serv.2d 408 (D.D.C. 1979) (disclosures to investment banker to secure an independent, arm's-length opinion) (*citing Brown v. United States,* 478 F.2d 1038, 1040 (7th Cir.1973)). *But see Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 115 F.R.D. 308 (N.D.Cal.1987) (attorney's opinion letter remained privileged despite disclosure in business negotiations, where the disclosure was in anticipation of joint litigation and substantial steps to ensure confidentiality were taken). Whether such disclosures are viewed as indicating an intention to waive the privilege, to abandon confidentiality, or to use the communications for purposes other than seeking legal advice, the communications so disclosed cannot be withheld based on the attorney-client privilege. *See In re John Doe Corp.,* 675 F.2d at 488; *Horowitz,* 482 F.2d at 81.

■ Where attorney-client communications are selectively disclosed to third parties other than opposing litigants, the fairness rationale for extending a waiver to all attorney-client communications on the same subject matter does not necessarily apply. *See In re Sealed Case,* 676 F.2d 793, 809 & n. 54 (D.C.Cir.1982). Also, disclosing certain matters in business negotiations is not necessarily inconsistent with an intention to keep other matters pertaining to the negotiations confidential. But the third party disclosures here further indicate that IH did not intend attorney-client communication pertaining to the likelihood of IH's future liability for Wisconsin Steel's unfunded pension obligations or pertaining to Cravath, Swaine & Moore's recommendation that IH retain an independent investment banker to remain confidential. Moreover, as the *John Doe* case illus-

trates, the attorney-client communications disclosed to Lehman Brothers lost any privileged character they might have had.

## D. Miscellaneous

In a case involving discovery of this magnitude, mistakes and misunderstandings are bound to occur. IH and the PBGC have exchanged charges of bad faith in connection with various discovery mishaps. The incidents described in the parties' memoranda, such as misfiled or misnumbered documents and isolated instances of mistaken or belated claims of privilege appear to be nothing more than that. The parties should be able to resolve these inevitable foul-ups without resorting to this court. *See* N.D.Ill.Gen.Rule 12(d). This court does not believe such foul-ups are so serious that they bear on this motion.

## III. Summary

■ As the District of Columbia Circuit aptly observed in *In re Sealed Case,*

> [a] simple principle unites the various applications of the implied waiver doctrine. Courts need not allow a claim of privilege when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege. Thus, since the purpose of the attorney-client privilege is to protect the confidentiality of attorney-client communications in order to foster candor within the attorney-client relationship, voluntary breach of confidence or selective disclosure for tactical purposes waives the privilege. Disclosure is inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor.

676 F.2d at 818. That principle is controlling here. The burden is on IH to show that the documents sought by the PBGC are privileged and that the privilege has not been waived. IH has failed to meet that burden and on this record the PBGC appears to be entitled to the documents it seeks.

For the most part, the parties have not focused on individual documents. IH may

contend that individual documents or portions of documents remain privileged notwithstanding this order. Any claims by IH that attorney-client communications in particular documents (1) were not previously available to the PBGC or disclosed to other third parties and (2) relate to subject matter other than IH's potential liability for Wisconsin Steel's unfunded pension obligations or Cravath, Swaine & Moore's recommendation that IH retain an investment banker will be referred to a master.

Finally, the PBGC's motion to compel production of documents relating to IHs disposition of its Twine Mill division is denied. This matter is already very complex and trial is set to begin within three months. Production of these documents would be unduly burdensome and oppressive in light of the negligible probability that they will lead to anything that might be useful at that trial. The PBGC's motion to compel answers to interrogatories is also denied. The PBGC does not press its motion to compel an answer to interrogatory no. 6, in which it seeks information about pension guarantees made by IH in connection with other divestitures. In any event, that interrogatory is vulnerable on the same basis as the PBGC's request for the Twine Mill documents. The court also believes that, under the circumstances, IH's responses to interrogatory no. 1 (relating to the pension plan termination date) and interrogatory no. 7 (relating to the diversion of funds from Wisconsin Steel to Envirosonics) are sufficient.

## CONCLUSION

The PBGC's motion to compel the production of documents withheld by IH based on claims of privilege is granted, subject to the limitation set out above. The PBGC's motion is denied in all other respects.