SPSS, INC., Petitioner-Appellant, v. ELLEN CARNAHAN-WALSH *et al.*, Respondents-Appellees.

First District (5th Division)   No. 1—93—2130

Opinion filed October 21, 1994.

Lawrence R. Samuels, Jacquelyn F. Kidder, and Patricia K. Smoots, all of Ross & Hardies, of Chicago, for appellant.

David A. Belofsky, of David A. Belofsky & Associates, of Chicago, for appellee Ellen Carnahan-Walsh.

Bruce S. Sperling and Mitchell H. Macknin, both of Sperling, Slater & Spitz, P.C., of Chicago, for appellee John Grillos.

JUSTICE McNULTY delivered the opinion of the court:

Plaintiff SPSS filed this statutory appraisal proceeding, pursuant to section 11.70 of the Illinois Business Corporation Act of 1983 (805 ILCS 5/11.70 (West 1992)) (Act), for a judicial determination of the fair value of certain shares of SPSS class B common stock owned by defendants John Grillos, Ellen Carnahan-Walsh and Ronald Wanke. (SPSS and Wanke reached a settlement before trial and Wanke is therefore not part of this appeal.) Plaintiff appeals from the trial court ruling that the fair value of class B stock owned by defendants was $20.70 per share and awarding defendants their attorney fees and costs. We affirm.

In September 1990, SPSS issued to its shareholders a confidential

private placement memorandum (PPM) describing its proposed merger/recapitalization transaction, and informing shareholders Grillos, Walsh and Wanke that it was cancelling their SPSS stock and offering them $4.44 per share for their stock. The PPM stated:

"For purposes of the Recapitalization, the current equity of the Company has been valued at $18.7 million ***. There are currently 1,092,032 shares of capital stock outstanding. See STOCK OWNERSHIP. However, these shares do not have equal participation rights. In April 1986, the Company's capital stock was divided into two classes—class A Stock and class B Common Stock. The estimated value of the Company at the time—$14 million—was allocated solely to the class A Stock and the two classes share *pro rata* in any increase in the value of the Company over $14 million. Therefore, the class B Common Stock only shares in $4.7 million of the total equity valuation of the Company."

The per-share value of the class A and B stock was calculated as $18.44 per class A share and $4.44 per class B share. The PPM advised the shareholders of their right to dissent to the transaction. The transaction took place on October 10, 1990. Grillos, Walsh and Wanke dissented to the transaction, rejecting SPSS' offer of $4.44 per share for their class B stock. SPSS offered Grillos, Walsh and Wanke $2.08 per share, SPSS' estimated value of the shares. The dissenting shareholders responded with their own estimated fair value. Walsh and Wanke claimed the fair value of the class B stock was $27.58 per share, and Grillos claimed that the stock was worth $36.13 per share.

In February 1991, SPSS filed its petition for appraisal of stock against Grillos, Walsh and Wanke, requesting a judicial determination of the value of the stock. Grillos, Walsh and Wanke each filed counterclaims, claiming that SPSS misrepresented certain facts in the PPM. SPSS then filed a "counterclaim" against Grillos for breach of fiduciary duty, based on Grillos' actions while president of SPSS. SPSS also filed a "counterclaim" against Wanke, asserting malpractice, conflict of interest, and breach of fiduciary duty. Wanke was voluntarily dismissed from this action prior to trial.

On December 5, 1991, SPSS filed motions to disqualify David Belofsky and his law firm and Mitchell Macknin and his law firm from representing Walsh and Grillos, respectively, based on their communications with Wanke concerning matters relating to Wanke's prior representation of SPSS and on Wanke's breach of duty to SPSS. The trial court denied SPSS' motions to disqualify.

On December 10, 1991, the trial court entered an order severing "all counterclaims and counterclaims to counterclaims." The trial on the appraisal complaint began on June 10, 1992. Norman Nie, SPSS

founder, chairman and chief executive officer, testified as to the circumstances surrounding the issuance of the class B stock in 1986. Nie testified that the class B stock was issued to allow SPSS management employees to share in the future growth of the company. Nie testified as to the differences between the class A and class B stock, in that the class B stock had limited voting rights, it had a $14 million exclusion and it had limitations on transferability. Nie believed that SPSS' $4.44 valuation of the class B stock was fair. Nie testified that in 1987, shareholders James Rabjohn and Marcia McDermott redeemed their class B shares for amounts between $14.43 and $16 per share. He structured the redemption agreements to recite a purchase of the stock for $1, and a consulting agreement for the remaining $13 to $15 per share. Nie testified that no consulting services were performed and the actual value paid for the stock was the total amount, not $1 per share.

Nie testified that in October of 1986, SPSS executed a letter of intent to Pansophic Systems, Inc., which stated:

"Pansophic understands that at the present time SPSS has authorized two different classes of stock: Class A—Common Stock and Class B—Common Stock. SPSS shall adopt a plan of liquidation to distribute the Pansophic cash among its stock brokers with each class of SPSS Common Stock to be treated in parity with others."

Immediately after the Pansophic negotiations, SPSS repealed the class B restrictions (except the voting restriction), in pursuit of a subchapter S election, an election which was abandoned in early 1987. In March 1987, SPSS' accountants wrote SPSS, reminding it of the adverse tax consequences that would result from the repeal of the restrictions. The reinstatement of the restrictions required the approval of the class B shareholders. Later in 1987, the class B shareholders unanimously approved the reinstatement of the restrictions.

Nie also testified that SPSS' articles of incorporation provided:

"In the event of any liquidation, dissolution or winding up of the affairs of the corporation, whether voluntary or involuntary, the holders of the class A stock shall be entitled, before any assets of the corporation shall be distributed among or paid to the holders of the class B common stock, to be paid an aggregate amount for all holders thereof equal to $14,000,000. After the making of such payments to the holders of the class A stock, the remaining assets of the corporation shall be distributed ratably among the holders of the class A stock and the class B stock."

Nie testified that if the transaction did not trigger the liquidation preference, the class A and B stock would be treated the same.

Douglas Koch, an employee of Valuation Research who prepared

the class B stock valuations in 1986, testified that he understood SPSS' purpose in issuing the class B stock and the restrictions on it was to establish a $14 million starting point for the value of the class A stock and to allow key employees to share with the class A shareholders in the future value of the company above that amount. Koch also testified that he viewed the restrictions on it as creating a "permanent difference" in the value between the class A and B shares and that difference existed without regard to the nature of any particular transaction. Koch testified that at the time the stock was created in April 1986, SPSS retained Valuation Research to perform a tax appraisal for the class B stock. Before Koch arrived at his valuation number, he was told by SPSS that the purchase price of the stock was going to be $1 per share, and that a "nominal value" should be assigned to the stock. Pursuant to that valuation, SPSS prepared IRS forms for Grillos and Walsh to sign, with the $1-per-share valuation "filled in."

Bernard Goldstein, an SPSS director, testified that the board of directors believed it was appropriate to treat the class A stock as worth $14 million more than the class B common stock in the transaction and that, in his opinion, that allocation was fair based on the "differences in the rights and privileges between the shares." Goldstein also testified that $2.08 was the fair value of class B stock.

Michael Lavin, SPSS' auditor from Peat Marwick, testified that SPSS' temporary removal of some of the restrictions on the class B common stock in 1986, if not reversed, would have had an adverse and unintended effect on SPSS. Therefore, the restrictions were reinstated. Lavin testified that the reinstated restrictions represented a significant differential in value between class A and class B stock.

Richard Bail, a valuation expert, testified on behalf of SPSS that the value of SPSS' equity at the time of the transaction was between $15.3 and $19.98 million. He testified that the restrictions on the class B stock rendered the class B stock less valuable than the class A stock. Bail believed that as of October 10, 1990, the class B stock was worth between $1.32 and $6.79 per share and that both the $4.44 and $2.08 offers by SPSS were fair.

At the conclusion of SPSS' case in chief, the trial court granted the dissenters' motion for a directed finding that the transaction did not trigger the $14 million liquidation preference. The trial court concluded that the liquidation preference was inapplicable to this transaction.

Grillos called Ira Cohn as a valuation expert. Cohn testified that the value of SPSS' equity as a whole at the time of the transaction was $34.8 million. Cohn stated his opinion that Grillos was entitled

to a *pro rata* share of the overall company value and that because Grillos owned 2.035% of the total number of outstanding shares of SPSS stock, his stock was worth $31.86 per share.

Walsh testified as her own expert witness that the value of SPSS' equity as a whole was $30.1 million as of the transaction date. She further testified that the value of her class B stock was $27.58 per share, and that she arrived at that calculation by dividing $30.1 million by the number of SPSS shares outstanding.

The trial court determined that the fair value of SPSS' equity on October 10, 1990, was $20.7 million and that for the purpose of this transaction the per-share value of the class A and class B stock was equal. The trial court found the fair value of the dissenters' stock to be $20.70 per share. Based on that per-share value, Grillos and Walsh were awarded $459,995 and $60,030 for their stock, respectively, plus 9% interest *per annum* from October 10, 1990, to the date of payment. The trial court also awarded Grillos $100,000 in attorney fees and $10,780.75 in costs and awarded Walsh $35,000 in attorney fees and $1,654.70 in costs.

SPSS appeals, claiming that: (1) the trial court erred in denying SPSS' motions to disqualify defendants' counsel; (2) the trial court failed to adhere to the requirements of Supreme Court Rule 220 (134 Ill. 2d R. 220); (3) the trial court erred in finding that class B stock was equal in value to class A stock; and (4) the trial court erred in awarding defendants attorney fees.

■ SPSS first contends that the trial court erred in denying SPSS' motions to disqualify defendants' counsel. SPSS claims that Wanke, its former corporate attorney, disclosed confidential information to Grillos, Walsh and their lawyers concerning the matter at issue in this case, the value of the dissenters' stock. SPSS therefore moved to disqualify the dissenters' lawyers from participation in this case. The trial court denied the motions on the ground that Wanke was a party to the case and therefore entitled to discuss with the other defendants what he learned from SPSS as its lawyer.

In 1986, Wanke and his law firm, Jenner & Block, provided SPSS with legal advice regarding the creation of SPSS' class B stock, prepared documents and materials concerning the stock, and prepared amendments to the SPSS articles of incorporation establishing the relative rights accorded to classes A and B common stock. However, the record reveals that Grillos and Walsh also had access to the same information regarding the class B stock and quite likely obtained this information through means other than Wanke. Grillos was president, chief operating officer, and a member of the SPSS board and therefore had knowledge of and was involved in the creation of the

class B stock. Walsh was a member of SPSS' policy and planning committee at the time when the issuance of the class B stock was discussed. See *Gottlieb v. Wiles* (D. Colo. 1992), 143 F.R.D. 241 (attorney-client privilege cannot be asserted against former chief executive officer and board chairman since he was not an outsider, but within the class of people who would receive such communications).

Furthermore, any expectation of confidentiality regarding the alleged communication Wanke had with the dissenters regarding the value of the stock was waived when SPSS sued Wanke not just in this appraisal action, but when it filed a legal malpractice claim against Wanke. A party waives a claim of privilege by relying on a legal claim or defense, the truthful resolution of which required the examination of confidential attorney-client communications. See *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel* (N.D. Ill. 1987), 666 F. Supp. 1148.

We also find significant the fact that neither Wanke, nor his law firm, Jenner & Block, ever appeared on behalf of a party in this litigation. Wanke was represented in this case by David Belofsky, and once the malpractice claim was filed, by Schiff, Hardin & Waite. Neither Belofsky nor Schiff Hardin was ever counsel to SPSS. Grillos' lawyer, Mitch Macknin of Sperling, Slater & Spitz, had an even more remote connection to Wanke since Macknin was never Wanke's nor SPSS' lawyer. Even if Wanke did in fact disclose confidential communications to Grillos, Walsh and their lawyers, the remedy for such conduct would be against Wanke; it would not be to disqualify the lawyers representing others in this case who received such information.

■ SPSS next contends that the trial court erred when it forced SPSS to trial in violation of Supreme Court Rule 220 (134 Ill. 2d R. 220) and permitted defendants' expert to testify in violation of that rule. SPSS claims that it was not afforded an opportunity to depose Grillos' expert, Ira Cohn, until August 11, 1992, when the parties were in the midst of trial, and that it was not allowed to complete Walsh's deposition until the day before SPSS was ordered to close its case. Rule 220 states in pertinent part:

"In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. In any event, as to all expert witnesses not previously disclosed, the trial court, on its

own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, including rebuttal witnesses, shall be disclosed. \*\*\* All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence." (134 Ill. 2d R. 220(b)(1).)

A violation of Rule 220 does not, however, require that the expert witness be barred from testifying. Our supreme court in *Sohaey v. Van Cura* (1994), 158 Ill. 2d 375, held that trial courts have discretion under Rule 220 once a violation has been determined. A new trial would not be warranted unless SPSS could show that it was prejudiced by any violation of Rule 220. (*Burke v. 12 Rothschild's Liquor Mart, Inc.* (1991), 209 Ill. App. 3d 192, 568 N.E.2d 80.) The record reveals it was not until the day before trial that SPSS mentioned its Rule 220 objections to the trial court. In a hearing held on April 20, 1992, the trial court set the trial commencement date for June 1, 1992. Rather than object to this date, SPSS' counsel stated that it would be ready to proceed to trial on that date. By waiting until the first day of trial to raise its Rule 220 violation, SPSS waived the right to raise this issue. *Kosinski v. Inland Steel Co.* (1989), 192 Ill. App. 3d 1017, 549 N.E.2d 784.

Even if SPSS had not waived this issue, we would not resolve the issue in SPSS' favor. SPSS has failed to show that it suffered any prejudice from any Rule 220 violation. The record reveals that SPSS had almost three months from the time it took Cohn's deposition to the time he testified at trial. In fact, the trial court granted a month and a half break in the trial so that SPSS would have ample opportunity to prepare for Cohn's testimony. This certainly gave SPSS adequate time to prepare for Cohn's testimony at trial. Furthermore, SPSS has not alleged that Cohn's testimony presented any surprises or new disclosures. Nor was SPSS prejudiced by Walsh's testimony since the trial court stated that it gave "zero value" to Walsh's testimony as an expert.

■ SPSS next contends that the trial court committed reversible error in ruling that the class B stock was equivalent in value to the class A stock. At the close of SPSS' case in chief, defendants brought motions for a directed finding that the "liquidation preference" was not "triggered" by the transaction because the transaction was not a "liquidation, dissolution or winding up" of the affairs of SPSS. The trial court granted those motions, ruling that the liquidation preference was inapplicable to the transaction. Since the trial court made

this determination as a matter of law, we will determine the correctness of the ruling independently of the trial court's judgment. (*South Suburban Safeway Lines, Inc. v. Regional Transportation Authority* (1988), 166 Ill. App. 3d 361, 519 N.E.2d 1005.) Even applying that standard, our review of the record leaves absolutely no doubt that the liquidation preference is inapplicable to the transaction at issue here. The transaction was not a liquidation, dissolution or winding up of the affairs of the corporation. Rather, it was a merger/recapitalization between SPSS and a newly formed corporation, with SPSS the surviving corporation. There is no evidence to suggest that the transaction constituted one of the three events covered by the $14 million preference.

The trial court determined that because the liquidation preference did not apply, the class A and B stock were of equal value and the class B stock was worth $20.70 per share. The trial court's judgment as to "fair value" should not be disturbed on appeal unless the trial court's findings were against the manifest weight of the evidence. *Stanton v. Republic Bank* (1991), 144 Ill. 2d 472, 581 N.E.2d 678.

SPSS contends that the trial court's decision is incorrect because the restrictions on the class B stock render it less valuable. The articles of incorporation do establish the differences in voting rights, dividend rights, transferability and payment preferences between the class A stock and the class B stock. However, none of those differences have had any influence on the value of the class B stock in the past or in this particular transaction. As we noted above, the $14 million liquidation preference did not apply to this transaction; therefore, that preference has no impact on the value of the class B stock.

Although the class B stock had limited voting rights, the limitations did not apply to the particular transaction at issue here. In this transaction, the voting rights of the class B shareholders were equivalent to those of the class A shareholders. The class B shareholders had voting rights as to this transaction. This is evidenced by the fact that had SPSS not issued 600 new class B shares to an inside employee the day before the transaction, the dissenters' votes would have blocked the transaction. Thus the class B shareholders had significant voting power as to this particular transaction. Even SPSS' accountant admitted at trial that the difference in voting rights had no economic significance.

It is also evident that there was no economic consequence to the fact that the class A stock had a dividend preference while the class B stock had no right to a dividend. The evidence at trial revealed

that SPSS had never paid a dividend, nor did it have any plans to ever pay one.

We also find significant the fact that SPSS had treated the two classes of stock as equal in the previous transactions. Soon after the class B stock was created, SPSS negotiated to sell the company to Pansophic Systems, Inc. A letter of intent executed in October 1986 stated that the class B stock would receive the same value as the class A stock. Had that transaction with Pansophic gone through, the testimony at trial revealed that the class B shareholders would have received $28.80 per share. At the end of 1986, after the Pansophic negotiations, SPSS repealed the restrictions on the class B stock, while pursuing its election to convert to a subchapter S corporation. In early 1987, SPSS decided to abandon that election, but left the restrictions repealed. Later the stockholders were informed that the repeal of the restrictions would have adverse consequences on the company. The class B shareholders thus unanimously gave their consent to the reinstatement of the restrictions, without the receipt of anything in return. The Pansophic negotiations reveal that SPSS had treated the class A and B stock as equal prior to this transaction. At that time, the class B stock was valued at $28.80 per share, a far cry from the $4.44 offered to the class B shareholders in the transaction at issue here. Further, as noted by the trial court, it is difficult to believe that the class B shareholders would agree to the reinstatement of the restrictions, while receiving nothing in return, when doing so would significantly decrease the value of their stock.

The value assigned to the class B stock by the dissenters and SPSS varied significantly. Grillos' expert valued the stock at $31.86 per share and Walsh valued it at $27.58 per share. SPSS valued the class B stock at $4.44. The trial court did not accept either of these positions, but rather, valued the stock at $20.70. While SPSS' witnesses testified that the restrictions on the class B stock rendered it less valuable, none of these witnesses assigned an economic value to the restrictions. It is clear, however, that none of the restrictions were applicable to the transaction here. Furthermore, in the Pansophic transaction, the class B stock was valued by SPSS at over $28 per share and when SPSS redeemed the stock of other shareholders in 1987, it was redeemed at $15 or $16 per share. After hearing all of the evidence, the trial court stated the $20.70-per-share value it placed on the class B stock was "very, very conservative on this thing because there was evidence in the record that I could have gone up to $30 a share very easily." We do not find this determination to be against the manifest weight of the evidence.

■ SPSS next claims that the trial court erred when it awarded

defendants attorney fees. Defendants cross-appeal, claiming that the award of fees and costs to the dissenters should be increased. The trial court awarded Grillos $100,000 in attorney fees and $11,000 in costs and Walsh $35,000 in attorney fees and $1,600 in costs. Defendants claim that these awards should be increased since they covered only a third of the fees defendants incurred.

Section 11.70(i) of the Act provides in relevant part:

"The court *** shall determine all costs of the proceeding ***, but shall exclude the fees and expenses of counsel and experts for the respective parties. If the fair value of the shares as determined by the court materially exceeds the amount which the corporation estimated to be the fair value of the shares ***, then all or any part of the costs may be assessed against the corporation. If the amount which any dissenter estimated to be the fair value of the shares materially exceeds the fair value of the shares as determined by the court, then all or any part of the costs may be assessed against that dissenter. The court may also assess the fees and expenses of counsel *** as follows:

***

(2) *** if the court finds that [a] party *** acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided by this Section." (805 ILCS 5/11.70(i) (West 1992).)

In awarding attorney fees, the trial court here found that SPSS acted arbitrarily, vexatiously and not in good faith with respect to the dissenters' appraisal rights. We believe that there was ample evidence to support this finding. The evidence revealed that in 1986, SPSS valued the class B stock at over $28 per share and in 1987, stockholders redeemed their class B stock for amounts between $14.43 and $16 per share. Yet in the PPM, SPSS stated that it was offering $4.44 per share for the class B stock, and that if any shareholder exercised his dissenter's rights, SPSS would offer him an "estimate of value" of $4.44 per share. After the transaction was consummated, SPSS filed with the Secretary of State a statement that the shares of Grillos, Walsh, and Wanke had been cancelled for $4.44 per share. However, when Grillos, Walsh and Wanke timely exercised their dissenters' rights, SPSS offered them only an estimate of value of $2.08 per share. In attempting to force the dissenters to accept an inordinately low estimate of value, SPSS acted in bad faith. SPSS did not even attempt to comply with the appraisal requirement that SPSS offer payment of an estimate of fair value to the dissenters before the commencement of an appraisal lawsuit. The fact that the trial court valued the stock at 10 times that offered by SPSS clearly justifies the trial court's award of attorney fees.

Further evidence of SPSS' bad faith is the fact that two days

before SPSS issued the PPM, Grillos, Walsh and Wanke collectively owned more than one-third of the class B shares. On the day before it issued the PPM, SPSS issued 600 additional class B shares to an employee of SPSS, thereby reducing the percentage ownership of Grillos, Walsh and Wanke to just under one-third of the new amount of outstanding class B shares. Without the issuance by SPSS of the 600 class B shares on the day before the transaction, SPSS would not have been able to obtain the requisite approval for the transaction. SPSS thereby acted in bad faith when it deprived the dissenters of their leverage that could have enabled them to stop the transaction.

We also take into account the fact that after the trial court ruled that the liquidation preference did not apply in this case, SPSS continued to vigorously pursue and prolong this litigation while fully knowing that its position was meritless. For these reasons, we find that the trial court properly awarded attorney fees.

As to the dissenter's contention that the awards of attorney fees should have been increased, we simply cannot say on the record before us that the amount set by the trial court was an abuse of discretion. (See *Totz v. Continental Du Page Acura* (1992), 236 Ill. App. 3d 891, 602 N.E.2d 1374.) We do, however, believe that the dissenters are entitled to petition for and have a hearing on the issue of recovery of attorney fees incurred after the petitions addressed in this case were ruled upon as well as attorney fees incurred in this appeal. We therefore grant Grillos and Walsh 30 days from the date this opinion is filed in which to file petitions in the circuit court seeking those fees incurred after February and March 1993, respectively, including those fees incurred on appeal.

Accordingly, the judgment of the trial court is affirmed. In addition, we remand this matter to the trial court for further proceedings consistent with the views set forth above.

Affirmed and remanded in part with directions.

MURRAY, P.J., and COUSINS, J., concur.