**NOBELPHARMA AB, Plaintiff,**

v.

**IMPLANT INNOVATIONS, INC., Defendant.**

**No. 91 C 4632.**

United States District Court, N.D. Illinois, Eastern Division.

June 19, 1996.

Alan I. Becker, Daniel G. Litchfield, Douglas B. Harper, Burditt & Radzius, Chicago, IL, Jeffrey M. Olson, Lyon & Lyon, Los Angeles, CA, for Nobelpharma Ab.

Edward L. Foote, Peter Charles McCabe, III, Winston & Strawn, Chicago, IL, James Ray Wood, Steven J. Soucar, Wood, Phillips, VanSanten, Hoffman & Ertel, Chicago, IL, Stephen Gary Rudisill, Arnold, White & Durkee, Chicago, IL, Gomer Winston Walters, Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Ltd., Chicago, IL, Philip G. Koenig, Jason M. Honeyman, Wolf, Greenfield & Sacks, P.C., Boston, MA, for Implant Innovations, Inc.

Russel M. Pelton, Jr., Oppenheimer, Wolff & Donelly, Chicago, IL, pro se.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On July 23, 1991, Nobelpharma Ab ("NP") sued Implant Innovations, Inc. ("3i"), alleging patent infringement, and 3i counterclaimed, alleging antitrust violations. Between March 14, 1994, and May 4, 1994, this Court held the trial, in which this Court granted 3i's motion for judgment as a matter of law on NP's patent claim, and the jury found for 3i on 3i's antitrust counterclaim. Between May 12, 1994, and January 27, 1995, this Court resolved the issue of inequitable conduct and entered final judgment. On February 16, 1995, NP moved for judgment as a matter of law or, in the alternative, for a new trial. For the reasons discussed below this Court denies NP's motion for judgment as a matter of law and denies its alternative motion for a new trial. This Court, as the parties, proceeds immediately to the analysis.

### I. Analysis

#### A. Patent Claim

##### 1. NP's Motion for a New Trial

###### a. Standard of Review

Fed.R.Civ.P. 50(a)(1) ("Rule 50(a)(1)") governs judgments as a matter of law, and it provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

"In granting judgement as a matter of law after presentation of the plaintiff's case, the plaintiff's facts must be accepted as established and all reasonable inferences from

those facts must be drawn in the plaintiff's favor." *Allied Colloids, Inc. v. Am. Cyanamid Co.,* 64 F.3d 1570, 1573 (Fed.Cir.1995); *see Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1227 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996); *see generally, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### b. Invalidity

### 1) Best Mode

NP argues that it is entitled to a new trial on its infringement claim because this Court "erred in granting 3i's motion for judgment as a matter of law on the issue[ ] of best mode ... at the close of Nobelpharma's case in chief." Pl.'s Mot. at 2. NP argues that we "granted 3i's motion because Dr. Branemark testified that the technique used to obtain a micropitted surface on a 'Nobel product' was not described in the '891 patent specification." *Id.* Yet "there is no evidence in the record that this technique was known at the time the patent application was filed, nor is there any evidence of concealing a technique better than the one described in the patent application." *Id.* So "a reasonable inference can, and must, be drawn that Dr. Branemark's testimony concerning the technique used to form the micropitted surface on a 'Nobel product' related to developments subsequent to the filing date of the patent application." *Id.* at 3.

3i responds that NP is not entitled to a new trial because Branemark "testified that the manufacturing details to produce the claimed micropitted surface were secret and not disclosed." Def.'s Resp. at 1. 3i argues that Branemark's testimony was "unequivocal and dispositive," and 3i cites some of that testimony from trial transcript pages 1621–33, which testimony this Court reproduces below.

The first set of passages, bracketed below, concern the patent, column 7, lines 31 and following, which address micropitting.

Q. How do you get the micropitted surface described in Plaintiff's Trial Exhibit 2 on the surface of the Nobel product?

A. Using a [1] special manufacturing procedure which requires very special circumstances. There was a delegation

from Japan asking the same question, and I told them that you've got to [2] follow the recipe, which I unfortunately cannot disclose.

Tr. at 1629.

The second set of passages, bracketed below, concern the patent, column 4, lines 8 and following, which address micropitting.

Q. Is that method of making the micropitted surface disclosed ... in Plaintiff's Trial Exhibit 2?

. . . . .

A. Yes. Yes, that's part of it, and that is what the Japanese tried to follow, but [1] there were some minor details that were not included here and which proved to be quite important.

Q. So there are some [2] details in the manufacturing process that are not stated in this patent at this point and which are important to making the kind of micropitted surface the patent is intended to get, right?

A. I guess it might be like that, yes.

Tr. at 1629–30.

The third set of passages, bracketed below, concern the patent, column 4, lines 10 and following, which address micropitting.

Q. Can you obtain a micropitted surface simply by cutting a piece of titanium at a speed less than 20 meters per minute?

A. [1] If you are lucky.

Q. You may get that result and you may not, is that it?

A. Yes. That was a problem, you see.

Q. What factors can cause you to fail to get micropitting even though you were cutting the metal at less than 20 meters per minute?

A. In fact, [2] any of the small detailed recipes that I discussed before but did not specify.

Tr. at 1631–32.

The fourth passage purportedly concerns the standardized procedures for making the implants. Although 3i cites several pages of transcript, only two of the pages concern standardized procedures.

Q. Actually, my question went to the characteristics of the titanium metal.

A. Yes, yes. Well, I don't know. I guess it was intended to be included in the biologically flawless material, but I don't know. The requisite, of course, is that the bulk material should provide this final result of the surface.

Q. What year did the standardized procedure you just referred to come into being?

A. I don't remember the years now, but it's in the different reports and some of them are quite complicated when it comes to figures, but there was a development period from '65, introductory period from '65 to '71—through '71, I think. So from '72 the clinical procedure with healing time, et cetera, was more standardized.

Q. So in what year did the standardized procedure come into being?

A. I guess it was in 1972.

Tr. at 1632–33.

Title 35 U.S.C. § 112 ("§ 112") governs the best mode requirement, and, in relevant part, it provides: "The specification . . . shall set forth the best mode contemplated by the inventor of carrying out his invention." *See Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 926 (Fed.Cir.1990). "The purpose of the best mode requirement is to 'restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of the invention which they have in fact conceived.'" *Transco Prod., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 560 (Fed.Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995), (quoting *In re Gay*, 309 F.2d 769, 772 (CCPA 1962)). "A holding of invalidity for failure to disclose best mode requires clear and convincing evidence that the inventor both knew of and concealed a better mode of carrying out the claimed invention than was set forth in the specification." *Id.* (citing *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1578 (Fed.Cir.1991)).

In *Transco*, the court followed the *Chemcast* court's description of the proper best mode analysis, which has two steps. "The first [step], which is wholly subjective, involves determining whether the inventor knew of a mode of practicing the claimed invention that he considered to be better than any other at the time he filed his application." *Id.* at 560. "If the inventor contemplated such a preferred mode, the second step is to compare what he knew with what he disclosed to determine whether the disclosure is adequate to enable one skilled in the art to practice the best mode." *Id.* "The second step, which involves assessing the adequacy of the disclosure, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art." *Id.*

This Court finds NP's argument unpersuasive. The testimony reproduced above demonstrates that when Branemark filed his patent application, he contemplated a best mode of practicing his invention, but his disclosures were inadequate to enable one skilled in the art to practice that best mode. This Court notes, however, that its finding excludes the testimony purportedly concerning standardized procedures, which 3i misinterprets. In any event, as this Court stated at trial, Branemark "did say that the method of making the implant micropits was a secret not disclosed in the patent." Tr. at 2292. As this Court further stated, "Branemark said important details were not produced. The sentence is powerful, unequivocal, unambiguous, and devastating to the plaintiff's case." Tr. at 2295. This Court believed it then, and this Court believes it now. And in light of it, this Court did not err when it granted 3i's motion for judgment as a matter of law, even though the standard of review of review is high and patents are presumed valid. Therefore, NP is not entitled to a new trial on its patent claim.

#### 2) Other Grounds

This Court does not need to reach further, but it does on one issue, whether 3i can raise new grounds to support its motion for judgment as a matter of law. This Court reaches further because both parties raise new grounds at various points.

At this point, 3i argues that this Court's "decision at the close of Nobelpharma's case-in-chief declaring the '891 patent to

be invalid is also supported on [several] alternate ground[s]" Def.'s Resp. at 3. 3i further argues that it "may rely on any grounds which support [our] decision." *Id.* NP responds that "3i's attempt to buttress the grant of the JMOL with three theories not raised in its original motion should be rejected as contrary to law." Pl.'s Rep. at 2.

3i brought its motion pursuant to Rule 50(a), which, in relevant part, provides that the motion "may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and facts on which the moving party is entitled to judgment." Rule 50(a)(2). "Failure to state the grounds or the motion with specificity may provide grounds for denying the motion. But the requirement is not a technical one." 5A James Moore, *Moore's Federal Practice* ¶ 50.04 (2d ed. 1995). "Its purposes are twofold: (1) to assure that the trial court has an adequate basis for its decision; and (2) to afford the adverse party the opportunity to correct any possible infirmities in the proof presented." *Id.; see McKinnon v. City of Berwyn,* 750 F.2d 1383, 1388–89 (7th Cir.1984).

This Court finds 3i's argument unpersuasive. If 3i's new grounds supplement its Rule 50(a) motion, those grounds are improper for two reasons. First, they are untimely because 3i did not raise them before submission of the case to the jury. Second, and this is likely related to the first reason, they are contrary to the motion's purpose because they come so late that NP does not have the opportunity to correct any possible infirmities in the proof. If 3i's new grounds constructively amount to making a new motion under Rule 50(b), they are also improper, this time because this Court can grant a post-trial motion for judgment only on grounds advanced in the pre-verdict motion. 5A *Moore's Federal Practice* ¶ 50.08; Fed. R.Civ.P. 50(b) advisory committee's note to the 1991 Amendment; *see Coleman v. Lane,* 1995 WL 170025, *2 (N.D.Ill. April 7, 1995), *vacated on other grounds,* 1996 WL 167044 (N.D.Ill. Apr. 5, 1996).

3i cites to contrary authority, *Data Cash Systems, Inc. v. JS&A Group, Inc.,* 628 F.2d 1038 (7th Cir.1980), which wrote that the "prevailing party in the lower court may rely on any ground that supports the decision."

*Id.* at 1041; *cf. Creek v. Village of Westhaven,* 80 F.3d 186, 192 (7th Cir.1996) (writing that the "defendants argue as is their right that there are alternative grounds, grounds not reached by the district judge but not waived and therefore available to support the judgment as they are good grounds"). 3i's cite to *Data Cash* is inapposite because it concerns appellate review, and this Court is, of course, not an appellate court. Therefore, 3i can raise no new grounds to support its motion.

This Court denies NP's motion for a new trial on its patent claim.

### B. Antitrust Counterclaim

#### 1. NP's Motion for Judgment as a Matter of Law

##### a. Standard of Review

In *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341 (7th Cir.1995), the Seventh Circuit expressed the standard of review governing "the adjudication of a motion for a judgment as a matter of law." *Id.* at 343. The court wrote:

> If reasonable persons could not find that the evidence justifies a decision for a party on each essential element, the court should grant judgment as a matter of law—before trial under rule 56, later under rule 50, and use the same federal standard each time. By linking the standard for summary judgment to the standard for overturning a verdict, *Anderson* and *Celotex* leave no other option. We now adopt the federal reasonable person standard across the board: pre-trial, mid-trial, post-trial, and on appeal, for evaluating both the merits and the quantum of relief.

*Id.* (quoting *Mayer v. Gary Partners & Co.,* 29 F.3d 330, 335 (7th Cir.1994)). This Court "must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists 'any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed.' " *Id.* (quoting *Fulk v. Ill. Cent. R.R. Co.,* 22 F.3d 120, 124 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994)).

### b. Sufficiency of the Evidence on Monopolization

#### 1) Evidence of the Relevant Market

NP argues that 3i introduced insufficient evidence "to support the jury's finding that 'non-coated, screw-type machined titanium dental implants which have not been acid-etched' is a relevant market." Pl.'s Mot. at 5. NP argues that Professor Topel, 3i's economist who provided the definition of the market, included 3i's product in the market but excluded Core–Vent's "on the basis that customers would switch from [NP]'s to 3i's, but not to Core–Vent's." Id. at 6. NP argues that Topel's basis was "fundamentally flawed" because, during the 1992 FDA ban, 3i and Core–Vent gained additional implant sales. Id. Moreover, NP argues that "the evidence demonstrates that sellers of different styles of implants compete head-to-head for sales and monitor each others' prices; that doctors switch from one system to another; and the narrowest market recognized in the dental implant field ... is endosseous root-form dental implants." Id. (citing Pl.'s Ex. 998).

3i responds that it introduced sufficient evidence to support the jury's finding on the relevant market. 3i argues that Topel's definition of the relevant market, and his basis for that definition, are sound. According to 3i, the screw implants and the plasma spray implants "are simply not substitutes," and doctors do not often switch. Def.'s Resp. at 20. "When 3i is out of the [$185] plasma product, the customers who could buy the [$145] screw machined implant ... refused to do so." Id. "[W]hen [NP] was closed down by the FDA, the sales of 3i's machine titanium screw implant increased but there was no effect on the plasma product." Id. Similarly, during the close down, the sales of Core–Vent's $40 acid-etched product, which is supposed to mimic NP's screw implant, did not improve. So 3i argues that the various implant products do not compete, and "changes in the price of one of these products have no effect on the other." Id. at 19.

■ Certain claims of monopolization, such as the claims here, "require the trier of fact to delineate the 'relevant market.'" Fishman v. Estate of Wirtz, 807 F.2d 520, 531 (7th Cir.1986). "A relevant market is comprised of those 'commodities reasonably interchangeable by consumers for the same purposes....'" Id. (quoting U.S. v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). "In making this determination, the trier must decide whether the product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand." Id.; see Herbert Hovenkamp, Market Power and Market Definition, § 3.2 (1994) (writing that "[a] relevant market is the smallest grouping of sales for which the elasticity of demand and supply are sufficiently low that a firm with 100% of that grouping could profitably reduce output and increase price substantially above marginal cost"). "Price, use and qualities must be considered in determining whether products are reasonably interchangeable." G. Heileman Brewing Co. v. Anheuser–Busch, Inc., 676 F.Supp. 1436, 1475 (E.D.Wis.1987), aff'd, 873 F.2d 985 (7th Cir.1989) (citing E.I. du Pont, 351 U.S. at 396, 76 S.Ct. at 1008). This statement of the law is substantially similar to the one with which this Court charged the jury, and the parties do not contest it.

■ This Court finds NP's insufficiency of the evidence argument unpersuasive. First, Topel's basis for his definition was sound. NP's argument about the flaw derives from its skewed reading of the record. For example, 3i gained additional implant sales, but they were for screwed implants, not plasma implants, which result is consistent with Topel's testimony. Tr. at 3107. Also, Core–Vent gained additional implant sales, but those sales were insignificant, which result again is consistent with Topel's testimony. Tr. at 3222. Similarly, NP's other points reflect skewed readings of the record. There was testimony that the different styles of implants did not compete head-to-head for sales. Tr. at, e.g., 4787. There was testimony that doctors did not switch from one system to the other. Tr. at 3104. And, contrary to NP's argument, Plaintiff's Exhibit 998 does not state that it expresses the "narrowest market." Therefore, there was sufficient evidence to support 3i's definition of the relevant market. Likely realizing this, NP does not defend its argument on this point in its reply brief.

### 2) Noerr–Pennington and Walker Process

NP argues that it is entitled to *Noerr–Pennington* immunity from 3i's antitrust counterclaim. 3i responds that it may proceed with its *Walker Process* claim without regard to the *Noerr–Pennington* doctrine or, in the alternative, that it may take advantage of the doctrine's sham litigation exception.

The *Noerr–Pennington* doctrine derives from the holdings of two cases that, not surprisingly, included parties with the names Noerr and Pennington. In *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1960), the Court held that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136, 81 S.Ct. at 529. In *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court confirmed that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 670, 85 S.Ct. at 1593. And in *Cal. Motor Transport Co. v. Trucking Unltd.*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1971), the Court expanded the Noerr–Pennington doctrine, writing that "[t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government." *Id.* at 510, 92 S.Ct. at 611–12. "The right to access to the courts is indeed but one aspect of the right to petition." *Id.*

"*Noerr*, however, withheld immunity from 'sham' activities because 'application of the Sherman Act would be justified' when petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor.'" *Professional Real Estate Investors ("PRE"), Inc., v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993). In *PRE*, the Court outlined a two-part definition for sham litigation:

First the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor."

*Id.* at 60, 113 S.Ct. at 1928 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533).

On the other hand, in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court "concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." *Id.* at 174, 86 S.Ct. at 349. The Court noted that its "conclusion applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's infirmity." *Id.* at 177 n. 5, 86 S.Ct. at 350 n. 5; *see Argus Chemical Corp. v. Fibre Glass–Evercoat Co., Inc.*, 812 F.2d 1381 (Fed. Cir.1987). The Court, however, limited its conclusion somewhat, writing that "[i]t must be remembered that we deal only with a special class of patents, *i.e.*, those procured by intentional fraud." *Id.* at 176, 86 S.Ct. at 350. Justice Harlan elaborated on the Court's limitation; he wrote that "a private cause of action would not be made out if the plaintiff: (1) showed no more than invalidity of the patent arising ... [from] factors sometimes compendiously referred to as 'technical fraud.'" *Id.* at 179, 86 S.Ct. at 351 (Harlan, J., concurring).

The Court handed down *Walker Process* about six months after it handed down *Pennington*, but *Walker Process* did not mention *Noerr* or *Pennington*. Apparently, the Court believed that there was no necessary or inherent connection between the cases. Subsequent courts followed that view, and "[s]ince its creation, the *Walker Process* anti-

trust claim has always seemed to exist in a sort of patent-antitrust eddy of its own outside of the mainstream of the *Noerr* line of cases." James B. Kobak, Jr., *Professional Real Estate Investors and the Future of Patent–Antitrust Litigation: Walker Process and Handgards Meet Noerr–Pennington,* 63 Antitrust L.J. 185, 193 (1994).

In *PRE,* the Court unsettled that view with its now infamous footnote six. In its opinion's section III, the Court outlined its two-part definition of sham litigation. At the end of the section, the Court devoted a paragraph to defining the word sham through its opposite, the word genuine. The Court found that the word genuine has two senses, an objective and a subjective, and it concluded that "[t]o be a sham, therefore, litigation must fail to be 'genuine' in both senses of the word." 508 U.S. at 61, 113 S.Ct. at 1929. Then the Court dropped the footnote, which provides:

> In surveying the 'forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations,' we have noted that 'unethical conduct in the setting of the adjudicatory process often results in sanctions' and that '[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.' [quoting *Cal. Motor Transport,* 404 U.S. at 512–13, 92 S.Ct. at 613]. We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. Cf. ... *Walker Process,* 382 U.S. [at 176–77] [, 86 S.Ct. at 349–50]; *id.,* at 179–180 [86 S.Ct. at 351–52] ... (Harlan, J. concurring).

"Until *PRE,* the Supreme Court had never addressed how *Noerr* immunity or its limited sham exception applied to efforts to secure or enforce intellectual property rights." 63 Antitrust L.J. at 186. Still, *PRE* left unresolved the issue of how "*Noerr* applies to the ex parte application process," and in particular, how it applies to the *Walker Process* claim. *Id.*

The Federal Circuit has twice acknowledged the lack of a resolution, yet both times it has failed to remedy the situation. First, in *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573 (Fed.Cir.1993), the court found that, because the defendant "failed to pierce [the plaintiff's] *Noerr* immunity with proof that the infringement action was objectively baseless or frivolous, [it] need not consider [the plaintiff's] subjective motivations in bringing the suit." *Id.* at 1583. In a footnote, the court wrote that it "need not decide the applicability of *Noerr* immunity to a litigant who sues on a patent procured by fraud, [citing *Walker Process* ], because that issue is not raised here." *Id.* at 1583 n. 10.

And second, in *Filmtec Corp. v. Hydranautics,* 67 F.3d 931 (Fed.Cir.1995), the court found that the plaintiff's patent infringement suit was not objectively baseless and it affirmed the district court's denial of the defendant's motion to amend its answer because, "in view of all that has transpired in the case," amending the answer "would be a futile act." *Id.* at 939. Again in a footnote, the court wrote that, "[i]n light of our holding that Filmtec's patent infringement suit was not objectively baseless, we need not decide whether Filmtec's suit was in bad faith or otherwise motivated by anticompetitive intent." *Id.* at 939 n. 2. The court continued: "Nor need we decide whether *Noerr–Pennington* immunity is vitiated by fraud on the patent office.... Thus, we again avoid determining what effect *PRE* has had on *Walker Process* and its progeny." *Id.*

This Court could interpret *Filmtec* as indirectly holding that the *Noerr–Pennington* analysis subsumes the *Walker Process* analysis. The *Filmtec* court engaged in a *Noerr–Pennington* analysis before reaching the *Walker Process* analysis. Moreover, the court wrote that its holding concerning the *Noerr–Pennington* analysis' exception's first prong, that the suit was not objectively baseless, made it unnecessary for it to engage in the *Walker Process* analysis.

This Court, however, does not interpret *Filmtec* as intending such an indirect holding because such an interpretation would be over-reaching. In *Filmtec,* the court wrote that it avoided "determining what effect *PRE* has had on *Walker Process* and its progeny." 67 F.3d at 939 n. 2. So if this Court interpreted *Filmtec* as determining the effect, meaning interpreted it as intending the indi-

rect holding, this Court would run afoul of the *Filmtec* court's express language, something this Court has no authority or desire to do.

This Court also does not interpret *Filmtec* as intending such an indirect holding because such an interpretation would be incorrect in light of rulings from other circuit courts. In *Liberty Lake Investments, Inc. v. Magnuson,* 12 F.3d 155 (9th Cir.1993), *cert. denied,* — U.S. ——, 115 S.Ct. 77, 130 L.Ed.2d 32 (1994), the court explained that, "[i]n a case involving a fraudulently-obtained patent, that which immunizes the predatory behavior from antitrust liability (the patent) is, in effect, a nullity because of the underlying fraud." *Id.* at 159. And the court wrote in dictum that "[r]ead in context with the entire [*PRE*] opinion, footnote 6 does not obviate application of the Court's two-part test for determining sham litigation in the absence of proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of it's legitimacy." *Id.* In *Hydranautics v. Filmtec Corp.,* 70 F.3d 533 (9th Cir.1995), the court was "faced with deciding whether the dictum in *Liberty Lake* is good law, and [the court] conclude[d] that it is, at least where fraud is intentional, not 'technical fraud.'" *Id.* at 538.

Further, in *Whelan v. Abell,* 48 F.3d 1247 (D.C.Cir.1995), the court explained that "[h]owever broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods." *Id.* at 1255. "Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been beyond the protection of *Noerr.*" *Id.* (quoting *Fed. Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n,* 663 F.2d 253, 263 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). Finally, the court cited with approval the *Liberty Lake* court's interpretation of the *PRE* court's footnote 6. *See id.*

Further still, although Kobak cautions that "[n]othing in *PRE*'s footnote 6 or anywhere else guarantees that the *Noerr* world and *Walker Process* world will forever remain parallel universes," he provides additional,

sound explanations for their remaining parallel. 63 Antitrust L.J. at 209.

To be sure, a distinction might exist for *Noerr* purposes between stretching the truth or improperly influencing a policy maker on the one hand and, on the other, doing the same thing to a more ministerial official whose function is to apply policy set by others (as embodied in the patent law) to specific facts in ex parte proceedings. In the first case, as we have already observed with respect to litigation, inputs are available from many sources, and we want to encourage access and advocacy; in the second case, we encourage accuracy and deliberately limit access. Furthermore, in a legislative or policy context, it may often prove difficult to determine whether the decision would have come out the other way absent a lie or a bribe. This problem is likely to be far less acute in the case of ex parte patent examinations. . . .

*Id.* On the other hand, Kobak noted that "*Noerr* has been applied in many contexts in the thirty years since *Walker Process,* and it does not take great feats of imagination to characterize an application for a patent as a petition to the government or the prosecution of a patent as an effort to pursue legitimate channels of government, however illegitimate the methods employed." *Id.* Yet on those points, this Court believes that the D.C. Circuit's arguments prevail. *See Whelan,* 48 F.3d at 1255.

 Therefore, given the lack of guidance from the Supreme Court and the Federal Circuit, this Court turns to the Ninth and D.C. Circuits for their persuasive resolutions of the issue of whether the *Noerr–Pennington* doctrine has overtaken the *Walker Process* claim. This Court, as the Ninth and D.C. Circuits, holds that *PRE*'s "two-part 'sham' test [is] inapplicable where there was 'proof' that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the [prior] litigation of its legitimacy." *Id.* (quoting *Liberty Lake,* 12 F.3d at 159). Moreover, as in *Walker Process,* paraphrased, "[t]his [holding] applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's [fraudulent derivation]." 382 U.S. at

177 n. 5, 86 S.Ct. at 350 n. 5. Below, this Court reviews the evidence and consider whether there was sufficient proof of NP's knowing fraud.

### 3) Evidence of the Fraud

■ NP argues that 3i introduced insufficient evidence on four grounds for a jury to find that NP obtained the '891 patent by fraud. Pl.'s Mot. at 6–8. This Court needs to reach only the first ground, which concerns prior art. Specifically, NP argues that "3i did not introduce sufficient evidence that the invention claimed in the '891 patent was anticipated or obvious in view of the prior art not submitted to the Patent Office." Id. at 7. 3i "failed to introduce any evidence that the inventors, their agents, or their attorneys knew of the materiality of the prior art." Id. Moreover, 3i "failed to introduce any evidence that one of ordinary skill in the art at the relevant time would have interpreted the prior art in the same manner as 3i's expert." Id. (NP also argues that this Court erred by failing to instruct "the jury as to the claim interpretation resulting in the directed verdict of non-infringement." Id. at 7 n. 3.) This Court discusses that argument in Section I.B.2.g.

3i responds that it introduced sufficient evidence on anticipation or obviousness. 3i argues that "Branemark ... provided Barnieske with a full set of documents, including Dr. Branemark's titanium implant patent obtained prior to 1977 (AGA) and the 1977 book," which prior art anticipated the patent. Def.'s Resp. at 24. Moreover, 3i argues that Barnieske knew that the prior art was material. He received a draft Swedish patent application that identifies the 1977 Book at least three times as prior art, yet, using that draft as the basis for the application to the U.S. Patent Office, he deleted the references to the Book, concealing them from the Patent Office. See id. at 24–25. Given these and other facts, Mr. Lipman, one of 3i's experts and a former employee of the Patent Office's legal department, concluded that "there were material misrepresentations to the Patent ... Office with respect to the prosecution of the '891 patent." Tr. at 2599.

The legal inquiry follows from Walker Process, in which the Court "held that maintenance and enforcement of a patent procured by knowing and willful fraud may meet the intent and conduct elements of violation of the Sherman Act...." Abbott Labs. v. Brennan, 952 F.2d 1346, 1355 (Fed.Cir.1991), cert. denied, 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); see Hewlett–Packard Co. v. Bausch & Lomb, Inc., 882 F.2d 1556, 1563 (Fed.Cir.1989), cert. denied, 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990); Argus Chemical, 812 F.2d at 1384.

This Court finds NP's argument unpersuasive. 3i introduced sufficient evidence for a reasonable jury to find that, when NP filed its application with the U.S. Patent Office, it procured its patent with knowing and willful fraud. The parties continue to debate Barnieske's awareness of the materiality of the 1977 Book, with much of their debate centering on his testimony that, if Branemark told him that Branemark published in 1977 an article in which there appeared micrographs of the same implant surfaces for which he asked Barnieske to prepare a patent application, Barnieske would not have prepared, or filed, such an application. Tr. at 2710. Given the rest of the testimony, however, and particularly given Barnieske's removal of references to the 1977 Book in the application to the U.S. Patent Office and Lipman's comments related to the removal, the jury had sufficient basis to find that, at the time, Branemark and Barnieske, on behalf of NP, knew what they were doing, and what they were doing was fraudulent.

### 4) Evidence of NP's Knowledge of the Fraud

NP argues that "3i failed to prove that [NP] had actual knowledge of this alleged fraud at the time it commenced this litigation." Pl.'s Mot. at 8. NP argues that 3i "sought to establish knowledge" in two ways. Id. First, 3i sought to establish it "based on an alleged joint venture relationship between the inventor (Professor Branemark) and [NP]." Id. "However, there is no evidence of an agreement between Branemark and [NP] to share profits and losses, a requisite element of a joint venture." Id. at 9. (This is a requisite element under the Illinois law of joint venture.) NP argues that this Court erred by instructing the jury using Illinois

law, that instead this Court should have instructed the jury using Swedish law. This Court discusses that argument in Section I.B.2.g.

3i responds with a three-part argument. First, 3i argues that NP waived its argument. "To begin with, the 'fatal fact' that this record discloses is that the motion for a directed verdict did not include one line or suggestion that the evidence was insufficient to establish agency or a joint venture." Def.'s Sur–Reb.Br. at 31–32. Second, 3i argues that, in any event, NP brought an objectively baseless suit. "[T]he fraudulent procurement of a patent—and the antitrust violation which may follow—applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's infirmity." *Id.* at 33 (internal quotations omitted). And third, 3i argues that the record contains sufficient evidence for the jury to find that there existed a joint venture relationship. In particular, "there are ... provisions relating to the sharing of profits (in the form of royalty payments)." *Id.* at 37.

■ This Court rejects 3i's first argument, which concerns waiver. When NP moved for a directed verdict, it stated that "3i has presented no evidence establishing that [NP] participated in the procurement of the '891 patent." Tr. at 3547. Now 3i argues that no one ever argued that NP procured the '891 patent; only that NP's joint venturer or agent procured it. Yet if 3i's joint venturer or agent argument succeeded, the practical, or legal, consequence would be that NP participated, albeit by proxy, in the procurement. So 3i's interpretation of NP's statement is overly cramped and limited.

■ This Court also rejects 3i's second argument, which concerns NP's bringing an objectively baseless suit. This Court foreclosed that argument when this Court denied 3i's motion for summary judgment. "An action that is well enough grounded, factually and legally, to survive a motion for summary judgment is sufficiently meritorious to lead a reasonable litigant to conclude that they had some chance of success on the merits." *Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 261–62 (N.D.Ill.1993). "*PRE*'s objective test also means, in theory at least,

that baseless litigation claims can often be resolved as a matter of law on motions to dismiss or for summary judgment (the posture of *PRE* itself).... Most of the reported decisions involving *Walker Process* or bad faith litigation claims since *PRE* have done just that." 63 Antitrust L.J. at 201.

■ This Court turns to 3i's third argument, which concerns joint venture. The law of joint venture in Illinois is well settled. "A joint venture is an association of two or more persons to carry out a single enterprise for profit." *Dawdy v. Sample,* 178 Ill.App.3d 118, 126, 127 Ill.Dec. 299, 532 N.E.2d 1128 (4th Dist.), *appeal denied,* 125 Ill.2d 564, 130 Ill.Dec. 479, 537 N.E.2d 808 (1989). "The existence of a joint venture is inferred from the facts and circumstances with the intent of the parties being the most significant element." *Id.* "Generally, the following elements are determinative of such an intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profits and losses." *Id.*

■ In this case, 3i argues that its provision to make royalty payments is sufficient to satisfy the fifth element. 3i's argument finds little support in the common law. For example, there is *Computer Teaching Corp. v. Courseware Applications, Inc.,* 191 Ill. App.3d 203, 138 Ill.Dec. 551, 547 N.E.2d 718 (4th Dist.1989). There, the parties "entered a joint venture to develop computer programs. The[y] later signed a royalty agreement which terminated the joint venture. This agreement provided defendant would assign all of its rights in the jointly developed programs to plaintiff in return for royalty payments to be paid by plaintiff upon marketing the programs." *Id.* at 204, 138 Ill. Dec. 551, 547 N.E.2d 718; *cf.* Def.'s Sur-Reb.Br. at 36–37. Similarly, there is *Grip–Pak, Inc. v. Ill. Tool Works, Inc.,* 651 F.Supp. 1482 (N.D.Ill.1986). There, Coors declined to enter into a joint venture with

Grip–Pak, fearing "the risk of liability for any patent infringement." *Id.* at 1495. "Since Grip–Pak had no money" to absorb such a judgment or to fund the development, Coors said it "would feel more comfortable owning outright the technology for Grip–Pak II[, so it] offered Grip–Pak $200,000 plus a royalty...." *Id.* And similarly, there is *Nature House, Inc. v. Sloan,* 515 F.Supp. 398 (N.D.Ill.1981), *aff'd,* 676 F.2d 700 (7th Cir. 1982). There, Nature House attempted to characterize its relationship with Sloan as a joint venture. The court, however, wrote:

> The relationship has none of the characteristics of a joint venture, in terms of sharing of profits and equality of control, and all of the indicia of an employment relationship with Nature House as an employer and Sloan as an employee. The fact that Sloan was to receive a royalty based upon net sales of his prints does not alter the underlying nature of the relationship between he and Nature House.

*Id.* at 400.

In each of these cases, the court concluded that the payment of a royalty either determined that the relationship was not a joint venture or that it had no impact on determining whether the relationship was a joint venture. These results make sense; the royalty payments go one way, they provide for sharing of profits, but not losses. Although in *Ambuul v. Swanson,* 162 Ill.App.3d 1065, 114 Ill.Dec. 272, 516 N.E.2d 427 (1st Dist.1987), the court wrote that "a joint venture has been found to exist where the agreement of the parties did not address the issue of the division of losses," that case is distinguishable, and 3i cites no other potentially contrary authority. *Id.* at 1070, 114 Ill.Dec. 272, 516 N.E.2d 427. No reasonable jury could find that NP and Branemark engaged in a joint venture based on the evidence that 3i introduced. Therefore, NP is entitled to judgment as a matter of law on this issue.

Second, 3i sought to establish knowledge of the alleged fraud based on "an alleged agency relationship between [NP] and Swedish counsel (Mr. Barnieske)." Pl.'s Mot. at 8–9. "3i contended that [Barnieske] was an agent of [NP] and was acting within the scope of his authority at the time the '891 patent application was being prosecuted." *Id.* at 9. "However, there is no evidence that [NP]

had the right to control the activities of Barnieske, a finding which is crucial to the existence of an agency relationship." *Id.* (Again, NP argues that this Court erred by instructing the jury using Illinois law). *See* Section I.B.2.g.

3i responds with the waiver and "objectively baseless litigation" arguments as it did above, plus three arguments concerning agency. First, 3i argues that "Barnieske's own Swedish file indicates that he was to invoice Bofors for all work done in connection with the Swedish counterpart of the '891 patent application." Def.'s Sur–Reb.Br. at 38. Second, Barnieske was sending Bofors and [NP] copies of correspondences from himself to the inventor regarding the status of the U.S. application, even though the U.S. patent prosecutions are secret." *Id.* And third, NP's "first president, Mr. Hans Claesson, testified that, in addition to Mr. Barnieske, the '891 patent was also prosecuted by Mr. Hans Fischer, Bofors patent expert." *Id.*

 The law of agency in Illinois is well settled. "The agency relationship is a consensual, fiduciary one between two legal entities, where the principal has the right to control the conduct of the agent and the agent has the power to affect the legal relations of the principal." *Taylor v. Kohli,* 162 Ill.2d 91, 95, 204 Ill.Dec. 766, 642 N.E.2d 467 (1994). "[T]his relationship need not depend on an express appointment, but may be found in the situation of the parties, their actions, and other relevant circumstances." *Matthews Roofing Co. v. Community Bank and Trust Co.,* 194 Ill.App.3d 200, 206, 141 Ill.Dec. 143, 550 N.E.2d 1189 (1st Dist.1990); *see Resolution Trust Corp. v. Hardisty,* 269 Ill.App.3d 613, 619, 207 Ill.Dec. 62, 646 N.E.2d 628 (3rd Dist.), *appeal denied,* 162 Ill.2d 580, 209 Ill.Dec. 808, 652 N.E.2d 348 (1995). "If the evidence shows one acting for another under circumstances implying knowledge on the part of the supposed principal of such acts, a *prima facie* case of agency is established." *Id.* (quoting *City of Evanston v. Piotrowicz,* 20 Ill.2d 512, 518, 170 N.E.2d 569 (1960)). "The existence of an agency relationship is a question for the trier of fact." *Id.*

This Court finds NP's argument unpersuasive; there is sufficient evidence of a principal/agent relationship. As 3i argued, there is evidence that Barnieske worked with one of NP's patent attorneys, that he invoiced NP for his efforts, and that he kept NP informed about the patent application. Given the situation, a reasonable jury could find that Barnieske was acting for NP and that NP knew of it. Moreover, it could find that NP had the right to control Barnieske's conduct, so in turn, it could find that a principal/agent relationship existed. Therefore, NP is not entitled to judgement as a matter of law on this issue.

And therefore, the *Noerr–Pennington* (and *PRE*) two-part sham test is inapplicable because there is proof of NP's knowing fraud upon, or intentional misrepresentations to, the Patent Office, which conduct deprived that prior litigation of its legitimacy. 3i's *Walker Process* claim survives, provided that the other elements necessary to the antitrust claim are present.

In any event, 3i proposed a viable alternative theory of antitrust liability, namely that NP, as the assignee of the patent, maintained and enforced the patent with knowledge of the patent's fraudulent derivation. The record reflects that two of NP's executive officers, Dr. Green and Mr. Nilsson, suspected the fraud. Prior to obtaining a legal opinion on the strength of the patent, Dr. Green asked Mr. Nilsson "how it was possible to get a patent when this textbook had been written by the principal investigator of the inventor of the implant," and Mr. Nilsson responded that "one was is if the Patent Office did not receive a copy of this book, and if that were true, then we would have a larger problem and that was fraud." Tr. at 2349. When the officers obtained a legal opinion, the lawyer, Mr. Lindley, confirmed their suspicions, saying that "if we were to sue anyone on the patent we would lose in the first round ... [because] there was prior art, not the least of which was this textbook that would invalidate the patent." Tr. at 2376. Based on the evidence, the jury found in a special interrogatory that NP "had knowledge that the '891 patent was obtained by fraud at the time this action was commenced against 3i in July, 1991." Special Interrog. No. 5. A reasonable jury could

have made that finding. And therefore, again, the *Noerr–Pennington* (and *PRE*) two-part sham test is inapplicable because there is proof of NP's knowledge of the patent's fraudulent derivation. *See Walker Process*, 382 U.S. at 177 n. 5, 86 S.Ct. at 350 n. 5.

This Court notes that NP argues in its opening brief that 3i failed to present sufficient evidence to support a jury finding that "the lawsuit under attack interfered 'directly with the business relationships of a competitor ... through the use of the governmental process ... as an anticompetitive weapon.' " Pl.'s Mot. at 10 (quoting *PRE*, 508 U.S. at 61, 113 S.Ct. at 1928). This Court rejects NP's argument, however, because it follows from the sham analysis that this Court has already found inapplicable and, in any event, despite 3i's responses on point, NP drops its argument in its reply brief. *See* Pl.'s Rep. at 9.

### 5) Evidence of the Causation

NP argues that there "is insufficient evidence in the record to support the jury's finding that [NP], through the existence of the '891 patent or enforcement of the patent in this action, caused 3i any injury." Pl.'s Mot. at 10. NP discounts 3i's contention that it suffered injury "because it did not make as many sales of implants as it sold abutments." *Id.* According to NP, "3i was not enjoined from manufacturing or selling its SSTI implants" and "there was no evidence ... that any buyer refrained from purchasing SSTI implants from 3i because of the '891 patent or this enforcement action." *Id.*

3i responds that "[t]he record contains direct testimony that without the patent—and [NP's] enforcement of it—the sales of 3i would have been substantially greater." Def.'s Resp. at 21. For support, 3i argues that "it's abutment sales were substantially greater than its implant sales—a circumstance that was the direct result of the patent." *Id.* Mr. Beaty testified that "[NP] sells more implants than they do abutments. And I believe that 3i would also sell more implants than abutments in a more normal market." Tr. at 4792. The U.S. market was not "normal" because NP "control[led] [it]," and "forced everyone out...." Tr. at 3115.

In the international market, where the '891 patent does not exist, 3i "sold approximately the same number of implants as they did abutments." Def.'s Resp. at 23.

In *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565 (7th Cir.1994), the Seventh Circuit reaffirmed the law on antitrust injury and causation. The court wrote that "[t]o establish an antitrust injury, a plaintiff must show not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was the 'cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred.'" *Id.* at 573 (quoting *Greater Rockford Energy and Technology v. Shell Oil*, 998 F.2d 391, 394–96 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994)). The court explained that "[t]he causation element of an antitrust injury stems, of course, from the requirement that a plaintiff show that his injury 'flows from that which makes the defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). "'[T]he plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and a substantial factor in producing, the injury.'" *Id.* (quoting *Greater Rockford*, 998 F.2d at 401).

This Court finds NP's argument unpersuasive. NP maintains that 3i's argument about its implant sales in relation to its abutment sales amounts only to an unsupported assumption, but that is untrue; Beaty's testimony and 3i's international sales ratio belie it. So NP next maintains that the international sales ratio is "misleading because there were counterpart patents existing outside the U.S." Pl.'s Rep. at 9 (citing Dr. Niznick's redirect testimony, in which he said that NP "intended to pursue its foreign patents that were corresponding to this patent"). This is inadequate. It is unclear, for example, whether the corresponding patents are identical, whether NP enforced them, whether it enforced them as ardently, or whether, through its enforcement, it attempted to protect a market share as formidable as the one it enjoyed in the U.S. Based on the evidence, a reasonable jury could find that NP caused 3i's injury. Therefore, NP is not entitled to judgment as a matter of law on this issue.

### c. Sufficiency of the Evidence on Attempted Monopolization

NP argues that, "[f]or the reasons described above, there is no legally sufficient evidentiary basis for a reasonable jury to have ... found" that NP unlawfully attempted to monopolize the relevant market. Pl.'s Mot. at 11. First, NP argues that "there is insufficient evidence to support the jury's finding of the relevant market and thus no reasonable jury could have found that a dangerous probability existed that [NP] would sooner or later achieve such a goal." *Id.* Second, NP argues that "3i failed to show [NP's] alleged exclusionary or restrictive conduct was the cause of 3i's lower volume of implant sales compared to its abutment sales." *Id.*

This Court, however, finds NP's arguments unpersuasive for the reasons discussed above in Section I.B.1.b.1), which concerns relevant market, and Section I.B.1.b.5), which concerns causation.

### d. Speculativeness of the Evidence for the Damage Award

NP argues that "[t]he jury's award is based on unsupported assumptions and thus must be set aside." Pl.'s Mot. at 11. First, "there is no evidence to support 3i's assumption that it would have sold the additional implants at its list price of $145/implant." *Id.* Second, "there is no evidence that any doctor refrained from purchasing 3i's surgical equipment or supplies because of the existence of the '891 patent or its enforcement and thus there is no evidence to support 3i's assumption that it would have sold an additional $72 of surgical equipment and supplies to doctors for every additional implant sold." *Id.* at 12. And third, "there is [in]sufficient evidence for 3i's assumption that but for the existence of the '891 patent and this enforcement action, 3i would have sold as many implants as it sold abutments." *Id.*

3i responds that the jury's damage award is based on the evidence from trial and is not speculative, so it should stand. "Total lost

profits were $4,035,720 based upon the fact that 3i should be selling as many implants as [it] does abutments." Def.'s Resp. at 21; *see* DX 3020 and 3004. Moreover, 3i argues that that lost profits figure is conservative for four reasons: (1) it excludes lost profits from 1990 and 1994; (2) it assumes that 3i would sell no more implants than it does abutments, unlike NP; (3) it assumes that sales would remain constant even if the price dropped; and (4) it discounts the acknowledged growth rate in the industry. *Id.* at 22.

This Court finds NP's argument is unpersuasive. 3i introduced sufficient evidence that it could have sold additional implants for $145 each. Beaty testified about Exhibit 3004, which includes the $145 figure, and he explained why that Exhibit "best projects our lost profits," even if 3i's average sales price was less than $145. Tr. 4791–93. Moreover, 3i introduced sufficient evidence from its business records that it suffered lost convoyed sales of $72 per implant. Tr. at 3124. And, as discussed above, 3i introduced sufficient evidence to support its argument that but for the existence of the '891 patent and NP's suit, 3i would have sold as many, if not more, implants as it sold abutments. *See* Section I.B.1.b.5). 3i's lost profits analysis has an adequate foundation, and a reasonable jury could have awarded to 3i the lost profits it sought without engaging in speculation. *See MCI Communications Corp. v. Am. Telephone and Telegraph,* 708 F.2d 1081, 1166 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Therefore, NP is not entitled to judgment as a matter of law on this issue.

### e. Sufficiency of the Evidence on Monopolization and attempted Monopolization against NP USA

NP argues that there is insufficient evidence to support the jury's verdict of monopolization and attempted monopolization against NP USA. First, NP argues that the patent was applied for in 1979 and issued in 1982, so NP USA, which did not incorporate until 1984, did not procure the patent. Pl.'s Mot. at 12. And second, NP argues that NP AB, not NP USA, commenced this action, so NP USA did not enforce the patent against 3i. *Id.*

3i, of course, disagrees. 3i argues that NP waived this argument because NP "did not raise this specific ground in its oral Rule 50(a) motion." Def.'s Resp. at 28 n. 6. "In any event, there was substantial evidence of record demonstrating [NP USA's] participation in enforcing the '891 patent to drive competitors out of the U.S. implant market." *Id.*

▆ This Court finds NP's argument unpersuasive. As 3i argues, NP waived its argument by failing to raise it in its Rule 50(a) motion. *See* Section I.A.1.b.2). Likely realizing this, NP drops its argument in its reply brief. Or perhaps NP drops it because 3i correctly points to sufficient evidence for a reasonable jury to find that NP USA participated in the enforcement of the patent. *See* Tr. 3132–37; 2937–39; 2944–45. Either way, NP is not entitled to judgment as a matter of law on this issue.

Therefore, NP is not entitled to judgment as a matter of law on 3i's antitrust counterclaim.

### 2. NP's Alternative Motion for a New Trial

#### a. Evidentiary Ruling Concerning Mr. Green

NP argues that this Court "erroneously permitted highly prejudicial testimony by a former officer of [NP], Ralph E. Green, Jr., regarding a legal opinion allegedly provided by a David Lindley, Esq." Pl.'s Mot. at 13. "Such a communication would be protected by the attorney-client privilege. Although [NP] never waived the privilege, the Court *sua sponte* relied on the crime/fraud exception as the basis for piercing the privilege." *Id.* NP argues that this Court's reliance was misplaced. (NP also argues that Mr. Green's testimony about Mr. Lindley's statements was inadmissible as hearsay, *Id.* at 13 n. 5, but this Court adequately ruled on that argument during trial, Tr. at 172–3.)

▆ 3i's first two responses concern waiver, which responses this Court rejects at the outset. First, 3i argues that "this entire issue has been waived since [NP] offered the testimony of Hans Claesson, its former president, on the subject of these very same com-

munications." Def.'s Resp. at 30. This Court rejects 3i's argument because NP offered the testimony after the fact, after Green's testimony. NP could not waive the issue retroactively. Second, 3i argues that NP "waived the attorney-client privilege by putting at issue its state of mind at the time this suit was filed regarding the validity and enforceability of the '891 patent." *Id.* at 28–29. This argument requires more discussion.

■■■■ In *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095 (7th Cir.1987), the Seventh Circuit addressed the law surrounding implicit waiver of the attorney-client privilege. Implicit waiver "can occur when a holder relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications." *Id.* at 1098. "To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case." *Id.; see Dawson v. New York Life Ins. Co.*, 901 F.Supp. 1362, 1368 (N.D.Ill. 1995); *In re Consolidated Lit. Concerning Int'l Harvester's Disposition of Wis. Steel,* 666 F.Supp. 1148, 1150–51 (N.D.Ill.1987). "Most often, this occurs through the use of an affirmative defense." *Id.*

■■■■ This Court finds 3i's implied waiver argument is unpersuasive. At best, the implication derives from NP's counsel's statement that "[t]he purpose of my witness is to be a witness who reviews the information and evidence that [NP] had at the time it made the decision to file the suit." Tr. at 2344. Yet, first, NP's counsel announced that he "had not changed [his] position" since this Court tentatively granted NP's motion to exclude Green's allegedly privileged testimony. Tr. at 2343; *see* Tr. at 172–76; *see also* Tr. at 3856. And second, NP's witness was a rebuttal witness, and there is no indication that he would raise new factual or legal issues. It appears that NP merely tried to defend itself against 3i's allegations. Therefore, NP did not implicitly waive its privilege. *Lorenz,* 815 F.2d at 1098.

3i's third response is that this Court "properly determined that 3i had made a prima facie case that [NP] had engaged in a fraud on the patent office and that its efforts to obtain a legal opinion regarding the '891 patent were in furtherance of its fraudulent scheme to monopolize the U.S. implant market." Def.'s Resp. at 29.

■■■■ "The attorney-client privilege is not unlimited in scope." *Ventre v. Datronic Rental Corp.,* 1995 WL 42345, at * 3 (N.D.Ill. Feb. 2, 1995). "The crime-fraud exception to the attorney-client privilege applies when a person consults an attorney to further a continuing or future crime, fraud or other misconduct." *Stopka v. Alliance of Am. Insur.,* 1996 WL 204324, at * 9 (N.D.Ill. April 25, 1996). The exception does not apply just because "a person consults an attorney in an effort to receive legal advice or assistance." *Id.* Moreover, the exception does not apply just because " 'it relates to a crime or fraud or because it would help to prove one existed.' " *Id.* (quoting *Sound Video Unltd., Inc. v. Video Shack, Inc.,* 661 F.Supp. 1482, 1486 (N.D.Ill.1987)).

■■■■ "[T]o drive away the privilege under the fraud/crime exception 'there must be something to give colour to the charge;' there must be 'prima facie evidence that it has some foundation in fact.' When that evidence is supplied, the 'seal of secrecy is broken.' " *U.S. v. Davis,* 1 F.3d 606, 609 (7th Cir.1993), *cert. denied,* 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563 (1994) (quoting *Matter of Feldberg,* 862 F.2d 622, 625 (7th Cir.1988) (quoting another case)). The Seventh Circuit "noted that 'prima facie evidence' did not mean 'enough to support a verdict in favor of the person making the claim.' " *Id.* (quoting *Feldberg,* 862 F.2d at 626). "Instead, we held that a party has established a prima facie case whenever it presents evidence sufficient 'to require the adverse party, the one with the superior access to the evidence and in the best position to explain things, to come forward with that explanation.' " *Id.* (quoting *Feldberg,* 862 F.2d at 626). This is a "lax standard[ ]." *Feldberg,* 862 F.2d at 626.

■■■■ Also, "[t]he moving party must also establish 'some relationship between the communications at issue and the alleged offense.' " *Stopka,* 1996 WL 204324, at 9 (quoting *Sound Video,* 661 F.Supp. at 1486).

"The moving party need not make a specific showing of the client's intent in consulting the attorney, but the evidence must support the inference that the attorney's representation or advice assisted the client in committing the alleged offense." *Sound Video,* 661 F.Supp. at 1486.

■■■ This Court finds NP's argument unpersuasive. 3i made a prima facie case by, for instance, eliciting testimony that NP knew that it did not disclose prior art such as Branemark's textbook, and yet it determined to sue competitors if for no other reason than to make those competitors pay for the costs of litigation. *See* Section I.B.1.b.4); Tr. at 2335 ("And Mr. Wessman then said that it wasn't necessary to get a legal opinion, that he wanted to sue Dr. Niznick anyhow so that he would spend money and time fighting the lawsuit"); *see also* Tr. 2369–74. 3i made a sufficient showing that the legal opinion was an afterthought, something that NP believed could help it perpetrate the fraud. That was the connection; the communication could help NP perpetrate the fraud. Generally, there was a sense of fraud in the air, which sense the jury later confirmed, and this Court felt comfortable ruling that NP waived its attorney-client privilege. NP is not entitled to a new trial on this issue.

### b. Evidentiary Ruling Concerning Mr. Vande Sande

■■■ NP argues that this Court erroneously excluded the testimony of Mr. George Vande Sande, a lawyer who "would have directly refuted Mr. Green's unexpected testimony concerning the alleged Lindley opinion." Pl.'s Mot. at 14.

3i responds that this Court properly excluded Vande Sande's testimony because NP gave untimely notice of its desire to call him as a witness and NP refused to comply with 3i's discovery requests on the subjects about which he would have testified. Def.'s Resp. at 31. Also, 3i argues that given Green's testimony and Claesson's corroborating testimony, Vande Sande's testimony was not crucial. *Id.*

In this case, this Court finds NP's argument unpersuasive. At trial, 3i argued that NP did not inform 3i of NP's desire to call Vande Sande until noon on the day before NP would have had him testify. Tr. at 3850. NP contested 3i's argument, Tr. at 3880 and following, but this Court is satisfied that 3i was unaware that Vande Sande would testify, and that NP's proffer of him was untimely. Moreover, again as 3i argued, if Vande Sande testified, 3i would have been in an untenable position because of NP's longstanding objections during depositions that precluded 3i from obtaining evidence with which to cross examine Vande Sande. *See* Tr. at 3851–55. 3i's counsel stated that 3i "has never been able to get any ... executive of [NP], Mr. Claesson, Mr. Ek, Mr. Nortoft, any of them, to basically answer the question as to what advice they received from their attorneys. Obviously these depositions go back, your Honor, to 1988. I don't think you can put Humpty–Dumpty back together again." Tr. at 3855. Considering the length of the trial, which this Court did not want to delay or disjoint, and considering Green's and Claesson's testimony, which would have limited the impact of Vande Sande's testimony, this Court ruled properly. NP is not entitled to a new trial based on this issue.

### c. Evidentiary Ruling Concerning Mr. Martens

■■■ NP argues that this Court erroneously excluded the testimony of Mr. Don Martens, NP's patent law expert. NP argues that this Court should not have ordered his "removal" while he was testifying or stricken his entire testimony. In particular, NP first argues that "the ruling was based upon an expert exclusion order that did not exist, ... which even if such a rule existed, would have been improper;" and second that "any violation of such a rule alone does not render a witness's testimony inadmissible in its entirety." Pl.'s Mot. at 14. Moreover, NP argues that this Court erroneously "interfered with the examination of Steven Lipman" by calling one of NP's counsel's lines of inquiry "ridiculous." *Id.* at 15.

3i responds that this Court correctly excluded the testimony of Martens. First, "[i]t was [NP] that surfaced the [witness exclusion] rule," so its objection that there was no such rule "is wrong and disingenuous." Def.'s Resp. at 16; *see id.* at 15. Second, 3i

**1262**

objected that Martens' testimony lacked foundation because he was not one skilled in the art, and the one who could have provided foundation, the one who was skilled in the art, Berlowitz, was unavailable because this Court struck the relevant portions of his testimony. And third, the testimony that Martens was offering had never been disclosed prior to trial; it was apparently disclosed when 3i was two-thirds through it antitrust case; that is sufficient grounds alone to strike the opinion." *Id.* at 15–16.

This Court finds NP's argument unpersuasive. To be sure, this Court initially based its ruling on the witness exclusion rule, although that rule has an exception for experts, which exception may be applicable here. *See* Tr. at 2602. This Court, however, provided an additional basis for its ruling, namely the one provided by 3i's second argument above that Martens' testimony lacked foundation. This Court stated, "I am going to rule now on all of Mr. Foote's objections to the lack of base for those questions on the previous witness.... I am now sustaining all of those objections." Tr. at 4670. NP does not argue with the substance of that basis, only that it came after the fact. This Court rejects that argument because this Court strove to provide a proper basis for its ruling, and it is not now concerned that the second basis came three transcript pages after the first one. *Cf.* Tr. at 4667 and 4670. This Court also rejects NP's argument that its dismissal of Martens in front of the jury was prejudicial. This Court believes that the manner in which it dismissed Martens was straightforward and professional; it involved no undue prejudice. *See* Tr. at 4667–68. Similarly, this Court rejects NP's argument that its "interfer[ence]" with NP's cross examination of Lipman was unduly prejudicial. This Court does not need to reach 3i's third argument. NP is not entitled to a new trial based on this issue.

### d. *Evidentiary Ruling Concerning Dr. Hodosh*

■ NP argues that this Court erroneously excluded the testimony of Dr. Hodosh. NP claims that his testimony would have shown "that the non-disclosed references cited by 3i (*i.e.* the AGA patents, the 1973 Weiss article and the 1977 Branemark book)

were cumulative references already cited to the Patent Office and/or not material to the invention claimed in the '891 patent." Pl.'s Mot. at 15. NP argues that this Court erroneously excluded his testimony when it, first, "distinguished between 'prior art' testimony in the context of an antitrust case from that in a patent case," and second, "concluded that Dr. Hodosh was only designated as an expert witness regarding 'prior art' in the context of a patent case." *Id.*

3i responds that this Court did not rule erroneously. First, 3i argues that this Court did not rule that Hodosh could not testify about prior art. Rather, NP made a choice not to have Hodosh testify on the subject, which choice NP may now regret, but with the consequence that NP waived its right to argue the point. Def.'s Resp. at 11. Second, 3i argues that NP attempted to introduce Hodosh's testimony in an untimely fashion, "amend[ing] its interrogatories adding 30 new opinions when 3i was two-thirds through its antitrust counterclaim." *Id.* at 12. "The Court certainly did not abuse its discretion in excluding expert opinions which had never been disclosed...." *Id.*

This Court finds NP's argument unpersuasive. This Court discussed what may be a distinction between prior art in one context and prior art in another, but that was not the basis, or certainly not the entire basis, of this Court's ruling on what Hodosh could testify about. On the other hand, this Court also finds 3i's first argument unpersuasive; this Court did rule that Hodosh could not testify about prior art in NP's defense of 3i's antitrust counterclaim. 3i's reference to this Court's statement that "I didn't say he couldn't testify on prior art" is inapt because it concerns this Court's ruling about the admissibility of testimony during NP's infringement case. Tr. at 4496. 3i's second argument, the one about timeliness, is closer to the mark. This Court stated that, "[i]n terms of the evidentiary [bases] of these rulings, in terms of its redundancy and of its cumulative nature, its not having been previously offered ... that should have been offered before." Tr. at 4496–7. Moreover, this Court also "subscribe[d] to everything that Mr. Foote said." Tr. at 4496. NP does

not object to these bases, and this Court stands by them. NP is not entitled to a new trial based on this issue.

*e. Evidentiary Ruling Concerning Mr. Ek*

 NP argues that this Court erroneously excluded "evidence [of] prior summary judgment motions challenging the validity of the '891 patent in other litigations, . . . and the decisions denying such motions." Pl.'s Mot. at 16. Moreover, NP argues that this Court erroneously barred Mr. Ek, the president of NP, "from testifying with regard to his knowledge concerning [those] rulings." *Id.* "Such evidence should have been admitted as probative of [NP's] good faith belief in the validity of the '891 patent." *Id.*

3i responds that this Court did not erroneously rule. "First, the Court properly barred evidence of the summary judgment opinions and decisions entered in the *Core–Vent* and *OTC* cases as being irrelevant and prejudicial." Def.'s Resp. at 30. Second, "[t]he Court properly barred Mr. Ek from testifying . . . because [NP] never permitted 3i any discovery on Ek's knowledge of" his communications with company attorneys regarding the *Core–Vent* and *OTC* cases. *Id.* NP claimed attorney-client privilege and refused to waive it to allow 3i to conduct its discovery.

In *Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994), the Federal Circuit wrote with reference to Fed.R.Ev. 403 that "it may be appropriate to admit evidence of prior litigation, but such evidence must pass muster, like any other evidence, as relevant and probative of an issue in the second case." *Id.* at 1573. "Further, if relevant, the proffered evidence may nonetheless be excluded . . . if its probative value is substantially outweighed by its prejudice to one's adversary because of the likelihood of confusion to the jury." *Id.* "There is no exemption from Rule 403 for evidence of prior litigation." *Id.*

This Court finds that NP's arguments may be persuasive, but if they are, they are nonetheless insufficient. The summary judgment motions and Ek's testimony about them may have been relevant during trial, and their substantive value may have outweighed their prejudicial effect. Also, as to the discovery

issue, the transcript is unclear about who asked Ek what and how Ek responded. This Court does not resolve those issues because their resolutions are unnecessary. First, the jury found that NP committed fraud on the Patent Office, which finding nullified what Ek would have claimed was NP's mindset when it brought this litigation, making his testimony irrelevant in retrospect and this Court's ruling harmless. And second, this Court already ruled that NP's suit as pleaded was not objectively baseless, which likely would have been the thrust of Ek's testimony about the prior litigation. (NP could not use it to enhance the presumption of validity. *Id.* at 1573.) So if this Court's ruling was erroneous, it was also harmless. NP is not entitled to a new trial based on this issue.

*f. Evidentiary Ruling Concerning Professor Hall*

NP argues that this Court erroneously excluded certain testimony of Professor Hall, NP's expert economist. NP argues that this Court erred at four points, by (1) "prohibiting [Hall] from using exhibits which he prepared to respond to certain points raised by Professor Topel," (2) "barring him from testifying about a particular survey of doctor attitudes which was relevant to market definition," (3) "barring him from testifying about the Medical Data Incorporated Report ("MDI") which was relevant to the issue of market definition and relied upon by 3i's expert," and (4) "barring his opinion testimony concerning [NP's] lack of market power." Pl.'s Mot. at 17.

3i responds that this court did not err, and it addresses each of NP's points, arguing that: (1) NP did not disclose the exhibits during discovery or disclose their underlying data; (2) NP did not disclose the opinions in the medical survey; (3) NP established no foundation for the MDI and chose not to use the report for limited purposes; and (4) NP did not disclose Hall's opinion on market power.

This Court finds NP's argument unpersuasive. In its reply brief, NP expresses the gist of its complaint, that the "limitations on the testimony of Professor Hall were improper and inequitable in that Professor Hall's

testimony was limited in ways which had been acceptable for 3i's economist, Professor Topel." Pl.'s Rep. at 15. That is incorrect. This Court imposed limitations on Hall that were specific to his testimony. Where those limitations differed from those imposed on Professor Topel, it was because Hall's testimony, and the foundations on which he based his testimony, differed or were differently presented. Moreover, as 3i argues on each of NP's four points, Hall's testimony faced certain limitations because of factors outside of its substance such as NP's discovery, disclosure and/or foundational abuses. *See, e.g.,* Tr. at 3939–40; Tr. at 3975–77; Tr. at 3918–20; Tr. at 3931–32; and Tr. at 3960–65. This Court reaffirms its rulings based on those abuses. NP is not entitled to a new trial based on this issue.

### g. Jury Instruction Rulings

First, NP argues that this Court "erred by allowing the jury to determine its own interpretation of the claims of the '891 patent in connection with the issue of materiality." Pl.'s Mot. at 17; *see id.* at 7 n. 3. 3i responds that "(a) [NP] never raised this issue at trial, (b) [NP] offered no instruction on the point and, (c) [NP] ... agreed to the parties' instruction on claim interpretation." Def.'s Resp. at 32 (citing Tr. at 4863–64, 4895–99, and 4928–29). So 3i argues that "[t]he point is waived." *Id.* NP fails to reply to 3i's waiver argument, conceding, as it must given the record, that the point is, in fact, waived.

Second, NP argues that this Court "erred by instructing the jury that [NP] had the requisite market power even if its market share was less than 50% if there were other evidence of monopoly power." Pl.'s Mot. at 18. NP further argues that the instruction was erroneous because there was insufficient "other evidence." 3i responds that this Court "carefully considered [NP's] objections to this instruction ... and ruled, correctly, that the instruction was proper, given the facts of this case." Def.'s Resp. at 33.

This Court finds NP's argument unpersuasive. NP's counsel stated at the jury instruction conference that "the point is that I don't think that it is proper ... to instruct the jury that if they agree with us that the relevant market is endosseous root-form dental im-

plants that they can still find [NP] to be a monopolist of that market." Tr. at 3708. Yet the jury disagreed with NP. Instead, it agreed with 3i's definition, finding in a special interrogatory that "non-coated screw-type machined titanium dental implants which have not been acid etched is a relevant product market." Spec. Interrog. No. 1. And 3i introduced sufficient evidence that NP had greater than a 50% share of that market. *See* Tr. at 3708. NP's counsel apparently admitted that if the jury found in favor of 3i's definition of the market, which it did in the interrogatory, NP's proposed instruction, the one that this Court rejected and is now at issue here, "is probably moot." Tr. at 3712. This Court goes further and finds that the instruction is definitely moot. In turn, NP's argument is moot.

Third, NP argues that this Court "erred by failing to instruct the jury that in order to find that [NP's] enforcement of the '891 patent through infringement action was an antitrust violation they must first find that this lawsuit was objectively baseless...." Pl.'s Mot. at 18. 3i responds that NP "does not point to any particular instruction as erroneous, and thus waives the point," plus the instructions regarding bad faith enforcement did not mislead the jury, and if anything "required a higher burden of proof" than the Supreme Court required in *PRE*. Def.'s Resp. at 33. As this Court discussed above in Section I.B.1.b.4), however, the jury did not need to find NP's enforcement action objectively baseless given its finding that NP engaged in knowing fraud. NP's argument, again, is moot.

Fourth, NP argues that this Court "erred by issuing an agency and joint venture instruction derived from Illinois law." Pl.'s Mot. at 19. According to NP, "Illinois law does not apply to a relationship between a Swedish citizen, Mr. Barnieske, and a Swedish corporation, Bofors, and to an agreement entered into in Sweden between a Swedish citizen, Mr. Branemark, and a Swedish company, [NP]." *Id.* "With respect to both of these issues, Swedish law imposes a more stringent standard." *Id.* 3i responds that NP does not explain how Swedish law differs from Illinois law, and NP "did not tender any

instructions during the trial which it contended were in accord with Swedish law." Def.'s Resp. at 33. Moreover, NP "even agreed with 3i as to the accuracy of the jury instructions on these points. The point is waived." *Id.* at 33–34.

■ This Court finds NP's argument unpersuasive. First, it is unclear how the Swedish law is more stringent, and, as 3i notes, NP provides no explanation, even in its reply brief. *See* Act on Commission, Commercial Agents and Traveling salesmen of 1914, ch. 3, arts. 77, 83 and 84; Act on partnership an Simple Companies of 28 June 1895, ch. 2, arts. 45 and 49. Second, it is clear that NP waived the issue. NP claims that it did not because this Court rejected its statement that "this agreement has to be interpreted under Swedish law, not under the State of Illinois," so making further statements about Swedish law or tendering jury instructions concerning Swedish law would have been futile. Tr. at 3745; *see* Pl.'s Rep. at 15. But this Court did not reject NP's statement of the applicable law. To the contrary, this Court stated that "we may have to use the Swedish law to interpret the strength of the contract and the obligations of the contract...." Tr. at 3749. Certainly, this Court made no ruling that Illinois law would definitely apply. NP has no excuse for not following through, and therefore, it waived the issue. And third, in any event, NP's argument may be moot because 3i's case did not rely exclusively on the agency liability; it also relied on assignee liability. *See* Section I.B.1.b.4).

Fifth, NP argues that this Court erred in instructing the jury regarding intent by setting "forth 3i's contentions regarding intent at length and improperly refusing to instruct the jury on [NP's] counter-contentions," instructing the jury merely that "'counter-defendants deny this allegation,'" which instruction NP argues was "unbalanced." Pl.'s Mot. at 19. 3i responds that NP waived the issue, that the instruction was not unbalanced, and if it was, it was not so unbalanced as to prejudice NP. As above, NP fails to reply to 3i's waiver argument, conceding, as it must given the record, that the issue is, in fact, waived. *See* Tr. at 5207–14. And in any event, even NP's counsel described the issue as "minor," which this Court believes

correctly describes it, so any "unbalance" was harmless. Tr. at 5207–14.

Therefore, NP is not entitled to a new trial on 3i's anti-trust counterclaim.

## C. Recusal Issues

NP argues that it is "entitled to a new trial before a different judge because the Court improperly presided over [the] trial since 3i was represented by a law firm where the presiding judge's daughter occupied the position of partner or its substantial equivalent." Pl.'s Mot. at 19. "Under these circumstances, a waiver from [NP] could not have been sought or given, thereby presenting the Court with the option to refuse to permit the law firm to appear in the case on behalf of 3i or recuse itself." *Id.* at 19–20.

3i argues that this Court's impartiality could not reasonably be questioned, 28 U.S.C. 455(a) ("§ 455(a)"), and if it could, NP waived its rights in the matter. "First, [NP] failed to file a petition for writ of mandamus." Def.'s Resp. at 35. "Second, each of the 455(a) grounds appear to be premised on events which occurred in open court," which is insufficient. *Id.* at 35–36. "Third, all grounds set forth in [NP's] recusal motion were reviewed extensively by the parties. Any fair review of the record will indicate that the motion was baseless and was promoted by evidentiary rulings of the Court which were adverse to [NP]." *Id.* at 36.

■ Section 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any preceding in which his impartiality might reasonably be questioned." "The rule in this circuit is well-established that a party moving for disqualification under § 455(a) must immediately move for a writ of mandamus in the event that the district judge denies the motion." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse—Wis., Inc.*, 991 F.2d 1249, 1255 (7th Cir.1993); *see U.S. v. Balistrieri*, 779 F.2d 1191 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986) (writing that "a timely" writ of mandamus is the "sole remedy"). If the party does not

move for a writ, "the argument is waived, and we give it no further consideration." *Id.*

In this case, NP moved for recusal on April 4, 1994, about three weeks into the trial, and this Court denied the motion. NP failed to move for a writ of mandamus. Therefore, NP waived the matter, and this Court gives it no further consideration, except to note that NP, likely realizing that it waived the matter, does not defend it in its reply brief.

Next, 3i argues that this Court did not need to recuse itself because of personal bias or prejudice toward a party, 28 U.S.C. § 455(b) ("§ 455(b)"), because, again, NP waived its rights in the matter. 3i asserts that "*SCA* does not correctly state the current 7th Circuit law." Def.'s Resp. at 35; *see SCA Servs., Inc. v. Morgan,* 557 F.2d 110 (7th Cir.1977). Moreover, NP "must acknowledge that the circumstances of this case are even more difficult to overcome than those set forth and reviewed by Judge Posner in *Union Carbide.*" *Id.; see Union Carbide Corp. v. U.S. Cutting Serv., Inc.,* 782 F.2d 710 (7th Cir.1986). Here, the Court obtained an express waiver from the parties with respect to the appearance in the case of Winston and Strawn after the disqualification of Phil Koenig and his firm. *Id.* NP's "practice is transparent: Assuming that the trial was proceeding in a manner favorable to [NP], then a motion would not be filed. It was obvious that by April 4, 1994, [NP] was concerned about its case and did not agree with the Court's disposition of several important issues." *Id.* at 36.

Section 455(b) provides in relevant part that any justice, judge or magistrate of the United States "shall also disqualify himself in the following circumstances: (5) He ... or a person within the third degree of relationship ... (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." Section 455(e) provides in relevant part that "[n]o justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)."

This Court does not pursue on the issue of waiver. First, given the language of § 455(e), there is little basis for waiving one's rights under § 455(b), particularly because to a great extent they are not the party's rights but, rather, the judiciary's rights in maintaining its own integrity. And second, although the *SCA* court's vitality on the issue of waiver is uncertain in the wake of subsequent Seventh Circuit common law, *U.S. v. Murphy,* 768 F.2d 1518, 1539 (7th Cir.1985), *U.S. v. Balistrieri,* 779 F.2d 1191, 1202–03 (7th Cir.1985), *Union Carbide,* 782 F.2d at 716, that uncertainty more concerns its holding on § 455(a) than on § 455(b). *Cf. Schurz v. Fed. Communications Comm'n,* 982 F.2d 1057, 1060 (7th Cir.1992) (chambers opinion) (reasoning broadly and perhaps clouding the § 455(a)–(b) distinction). Even in the wake of *Schurz,* "it is certainly arguable that the requirement of a timely filing of a motion for disqualification is not firmly established in this circuit." *Id.* at 1060. Because the requirement is not firmly established and because this Court does not need to base its decision on the requirement, this Court does not pursue the issue.

This court notes, however, that if it did pursue the issue it would find that NP's motion for disqualification was untimely and that, to the extent that it could, NP waived its rights. NP moved to disqualify 3i's initial counsel, Phil Koenig, and this Court granted its motion. So 3i brought in its replacement counsel, Winston and Strawn, and when it did this Court made plain to NP that this judge's daughter is a salary partner there. This Court made plain that fact on more than one occasion, and NP assured this Court that it was no problem, leading this Court to go forward with that assurance. Then in the middle of trial NP moved for recusal, likely, as 3i argues, because NP believed that the trial was not proceeding as it hoped. This Court could not abide that stunt; no court should abide it. It is precisely "the heads-I-win-tail-you-lose" litigating position that the *Schurz* court prohibited. *Id.* at 1060 (writing that the "requirement of timeliness 'prohibits the knowing concealment of an ethical issue for strategic purposes'"). Even though the waiver issue is not dispositive, it is compelling.

The merits are compelling as well, and this Court holds that § 455(b) is inappli-

cable. As this judge discussed with the parties in open court on more than one occasion, this judge's daughter is a salary, not an equity, partner at Winston, and this judge's daughter performed no work on this case and did not represent 3i in any legal matter. This judge knows of no interest that his daughter may have, or may have had, that could be substantially affected by the outcome of this proceeding. Therefore, this judge will not recuse himself.

In reaching this decision, this judge stands with a broad, deep and uniform body of authority. *See U.S. ex rel. Weinberger v. Equifax*, 557 F.2d 456, 463 (5th Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) (relative's salary interest as an associate insufficient to require recusal); *Wilmington Towing Co., Inc., v. Cape Fear Towing Co., Inc.*, 624 F.Supp. 1210, 1211 (E.D.N.C.1986) (same, summer associate); *Miller Indus., Inc. v. Caterpillar Tractor Co.*, 516 F.Supp. 84, 86 (S.D.Ala.1980) (same, of counsel); *Keene Corp. v. Rogers*, 863 S.W.2d 168, 172 (Tex.Ct.App.1993) (same); *see also U.S. v. Tierney*, 947 F.2d 854, 865 (8th Cir.1991); *Welch v. Bd. of Directors of Wildwood Golf Club*, 1996 WL 115433, \* 4 (W.D.Pa. Mar. 5, 1996); *Regional Sales Agency, Inc. v. Reichert*, 830 P.2d 252, 258 (Utah 1992); *Reilly v. S.E. Pa. Transp. Auth.*, 330 Pa.Super. 420, 479 A.2d 973, 982 (Pa.Super.Ct.1984); *and cf. In re Nat'l Union Fire Insur. Co.*, 839 F.2d 1226 (7th Cir. 1988); *Stewart v. GNP Commodities, Inc.*, 1992 WL 121545, \* 2 (N.D.Ill. May 26, 1992). This judge also stands with the ethical authority. Letter from the Committee on Code of Conduct of the Judicial Conference of the United States of March 27, 1996 (citing A.B.A. Model Code of Judicial Conduct (1990) Canon 3E(1)(d)(iii)) (available from this Court upon request).

To be sure, this case is distinguishable from those cited above, but the distinguishing features are immaterial. Most obviously, this case is distinguishable in that this judge's daughter is a salary partner instead of a salary summer associate, associate, or of counsel. But that is immaterial because the courts reason based on forms of income rather than forms of title. On the other hand, they also reason based on forms of indirect interest such as the derivation of value from the enhancement of a law firm's reputation, and one could speculate that the interest is greater for partners, whether salary or equity, than for others. But even if that speculation is correct, "this interest is simply too insubstantial to require disqualification." *Tierney*, 947 F.2d at 865.

Therefore, this judge correctly denied NP's motion for recusal.

## II. Conclusion

Therefore, this Court denies NP's motion for a new trial on its patent claim, and this Court denies NP's motion for judgment as a matter of law and its alternative motion for a new trial on 3i's antitrust counterclaim.